IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | CHAPTER 11 |
| | § | |
| ROTARY DRILLING TOOLS | § | CASE No. 16-33433 |
| USA, LLC, *et al.* | § | |
| Debtors. | § | Jointly Administration Requested |
| | § | |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING SECURED POST-PETITION FINANCING ON A
SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 363, 364, AND 507(B);
(II) GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO
11 U.S.C. § 362; (III) GRANTING RELATED RELIEF; AND
(IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

**THERE WILL BE A HEARING ON THIS MOTION ON JULY 8, 2016, AT 1:00 P.M. CST IN COURTROOM 400, 515 RUSK, HOUSTON, TEXAS 77002.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") here by move (the "Motion") for entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), pursuant to sections 105, 362, 363, 364, and 507(b) of Title 11 of the United States code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 4001, (i) authorizing the Debtors to obtain secured post-petition financing; (ii) granting related relief; and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) and (c). In support of this Motion, the Debtors rely on and incorporate by reference the *Declaration of Bryan M. Gaston in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed with the Court concurrently herewith.  In further support of the Motion, the Debtors, by and through their proposed undersigned counsel, would respectfully show the Court as follows:

### SUMMARY OF THE MOTION

1.      The Debtors seek immediately authority on an interim basis for a debtor-in-possession secured superpriority financing facility (the "DIP Facility") to provide funding for the operating expenses and working capital needs of the Debtors.  The Debtors also request a hearing for final approval of the proposed DIP Facility.[1]

---

[1] Unless specifically defined herein, capitalized defined terms used in this Motion will have the meanings as defined in the Interim Order and the DIP Term Sheet.

2

**EMERGENCY CONSIDERATION**

2.      The Debtors request emergency consideration of the Motion. The DIP Facility is necessary to ensure the continued operation of the Debtors' businesses pending a final hearing on this Motion.  Without immediate funding, the Debtors will not be able to continue as a going concern.  Accordingly, the Debtors believe that emergency consideration is necessary.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The legal predicates for the relief requested herein are Bankruptcy Code sections 105, 362, 363, 364, and 507(b), Bankruptcy rules 2002, 4001, and 9014, and Local Bankruptcy Rule 4001.

**STATEMENT PURSUANT TO BANKRUPTCY RULE 4001**

5.      By this Motion, pursuant to Bankruptcy Code sections 362, 363, 364, and 507(b), Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rule 4001, the Debtors request the following relief as provided for in the proposed Interim Order:

(a)      authority pursuant to Bankruptcy Code sections 363 and 364(c) and (d) to obtain debtor-in-possession secured financing through the DIP Facility pursuant to the following terms and agreements (collectively, the "DIP Financing Documents"):

    i.      the Interim Order, and any final order entered by this Court approving the Motion and DIP Facility (the "Final Order"), and

    ii.      the *Rotary Drilling Tools USA, LLC, et al. Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession Credit Facility Term Sheet*, attached to this Motion as **Exhibit B**, as may be amended, modified, and/or supplemented at or before the Final Hearing and presented to the Court (the "DIP Term Sheet"), entered into with PNC, as agent and lender (the "DIP Agent" and the "DIP Lender," respectively);

(b)     the grant to the DIP Agent, for the benefit of itself and DIP Lender, of superpriority administrative claim status pursuant to Bankruptcy Code sections 364(c)(1) and 507(b) in accordance with the terms of the Interim Order and Final Order;

(c)     authorization for the Debtors' use of cash collateral whenever or wherever acquired, and the proceeds of all collateral pledged to the Pre-Petition Lender, as contemplated by Bankruptcy Code section 363 in accordance with the terms set forth in the Interim Order and Final Order;

(d)     a grant of adequate protection measures to the Pre-Petition Lender under and in connection with the Credit Agreement and Pre-Petition Loan Documents in accordance with the terms set forth in the Interim Order and Final Order;

(e)     modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h); and

(f)     a Final Hearing on the Motion for entry of an order authorizing the DIP Facility and use of cash collateral on a final basis.

6.     The proposed DIP Facility contains the following material terms, which terms are qualified in all respect by the contents of the Interim Order and DIP Term Sheet:

| | |
|---|---|
| **Amount:** | A credit line of up to three million dollars ($3,000,000.00).<br><br>*See* DIP Term Sheet "Amount and Type of Facility". |
| **Agent:** | PNC Bank, National Association ("**PNC**" or the "**DIP Agent**").<br><br>*See* DIP Term Sheet "Agent". |
| **DIP Lender:** | PNC Bank, National Association (the "**DIP Lender**").<br><br>*See* DIP Term Sheet "DIP Lender". |
| **Debtors:** | (i)     Rotary Drilling Tools USA, LLC, a Texas limited liability company;<br>(ii)    Pipe Coatings International LLC, a Texas limited liability company;<br>(iii)   Rotary Drilling Holdings IV LLC, a Delaware limited liability company; and<br>(iv)    Tubular Repair, LLC, an Oklahoma limited liability company.<br><br>*See* DIP Term Sheet "Debtors" |
| **Guarantors:** | (i)     RDT Intermediate Holdco LLC, a Delaware limited liability company;<br>(ii)    RDT Brazil I LLC, a Delaware limited liability company; and<br>(iii)   RDT Brazil II LLC, a Delaware limited liability company<br><br>*See* DIP Term Sheet "Guarantors" |
| **Borrowing Availability:** | All borrowings under the DIP Facility shall be limited by the Budget (defined below), and borrowing Availability (as set forth below). The Budget shall be approved by Agent in its sole discretion.<br><br>Availability calculated as follows: all new advances under the DIP Facility shall not exceed, on a cumulative basis as of any date of determination, the lesser of (x) the Maximum DIP Advance Amount; or (y) the DIP Advance Amounts.  The DIP Advance Amounts may be further modified and amended from time to time only with the written |

| | |
|---|---|
| | consent of the Debtors and DIP Agent. The availability under the DIP Facility shall be reduced by reserves as may be established by DIP Agent in its reasonable discretion from time to time to reflect, among other things, contingencies or risks that may materially affect the DIP Collateral, the liens of Agent, in such DIP Collateral or the business and operations of the Debtors, including, without limitation, a reserve for the Carve-Out.<br><br>*See* DIP Term Sheet "Borrowing Availability" |
| **Budget and Variances:** | Cash receipts and disbursements from ongoing business operations, as well as cash disbursements for Professional fees, must be in accordance with a Budget approved by the DIP Agent. Cash receipts and disbursements shall be tested weekly at the line item level. Cash receipts and disbursements for ongoing operating matters, other than Professional fees, shall be subject to a 10% weekly and 5% cumulative approved budget variance.<br><br>Approved Budget Variance Reports are due on or before the 3rd business day of each week following the Petition Date.<br><br>*See* DIP Term Sheet "Budget and Variances", Interim Order ¶3. |
| **Facility Fees:** | The DIP Agent shall be entitled to a DIP Commitment Fee of $100,000; provided, that such fee shall only be payable if the outstanding obligations to the Pre-Petition Lender are repaid in full, in cash. The Debtors shall also pay fees and other charges payable in the amounts and at the times separately set forth in the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents.<br><br>*See* DIP Term Sheet "Fees". |
| **Term:** | Up to 60 days, subject to early termination as set forth in the DIP Term Sheet and other DIP Financing Documents due to one or more events of default.<br><br>*See* DIP Term Sheet "Termination Date". |
| **Interest Rate:** | Non default rate of Alternate Base Rate plus 3.5%. Upon an Event of Default under the DIP Facility, the interest rate may be increased by an addition 2% per annum.<br><br>Interest with respect to any outstanding obligations under the Pre-Petition Credit Agreement shall, to the extent permitted by applicable bankruptcy law, accrue from and after the Petition Date at the Non-Default Interest Rate and be due and payable by the Debtors on the date that the full amount of the DIP Facility is immediately due and payable.<br><br>*See* DIP Term Sheet "Non-Default Interest Rate and Payment Terms". |
| **Use of Proceeds:** | The DIP Facility contains customary limitations on the use of DIP Facility proceeds (and Carve-Out funds), including, without limitation, limiting expenditures to those set forth in the Budget; and other prohibitions on using such proceeds to challenge or otherwise contest the prepetition lien and claims of the Pre-Petition Agent and Pre-Petition Lender.<br><br>*See* DIP Term Sheet "Use of Proceeds", Interim Order ¶¶4, 14. |
| **DIP Collateral:** | First priority, priming lien on all assets of the Debtors, other than Avoidance Actions and certain real property collateral that the DIP Agent has affirmatively elected to exclude following the completion of requisite due diligence, subject to (i) the Carve-Out; and (ii) valid, enforceable, properly perfected and unavoidable prepetition liens (including any liens that are perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under section 546(b) of the Bankruptcy Code) that are senior to the liens of the Pre-Petition Agent and Pre-Petition Lenders. Such liens shall be automatically perfected upon entry of the Interim Order. The DIP Collateral shall not include any real property collateral unless and until the Agent has completed |

| | |
|---|---|
| | all due diligence that the DIP Agent deems necessary or desirable regarding such real property.<br><br>*See* DIP Term Sheet "Collateral Security" and "Lien Validation and Perfection", Interim Order ¶¶7, 8, 12, 37. |
| **Carve-Out:** | The DIP Liens, DIP Facility Superpriority Claims, Adequate Protection Liens and Prepetition Adequate Protection Superpriority Claims shall be subject to right of payment of the Carve-Out (as set forth in the DIP Term Sheet and Interim Order). Usage of the Carve-Out shall be subject to customary restrictions.<br><br>*See* DIP Term Sheet "Carve-Out" definition, Interim Order ¶¶13, 14. |
| **Priming of Certain Liens / Automatic Perfection:** | The DIP Agent, on behalf of the DIP Lender, is granted first priority senior and priming liens in all of the Debtors' property (excluding Avoidance Actions and proceeds thereof), pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, subject only to the Carve-Out and properly perfected, unavoidable prepetition liens senior to those of the Pre-Petition Agent and Pre-Petition Lenders. *See* Interim Order at ¶ 8  Such liens in favor of the DIP Agent and DIP Lender shall be automatically perfected upon entry of the Interim Order.<br><br>*See* DIP Term Sheet "Collateral Security", Interim Order ¶¶7, 8. |
| **Adequate Protection / Automatic Perfection of Replacement Liens:** | As adequate protection for its prepetition liens, the Pre-Petition Lender (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and  1114, subject to allowed claims paid under the Carve-Out and super-priority administrative claims of the Agent and DIP Lender under the DIP Facility; and (b) shall have valid, binding, enforceable and perfected replacement liens in all DIP Collateral, subject to the DIP Liens and Carve-Out, in each case equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of their respective pre-petition collateral.  Such adequate protection liens shall be automatically perfected upon entry of the Interim Order.<br><br>*See* DIP Term Sheet "Adequate Protection", Interim Order ¶10. |
| **DIP Agent Expense Reimbursement:** | The Debtors shall, as set forth in the DIP Term Sheet, promptly reimburse the DIP Agent for reasonable fees incurred by the DIP Agent (including, without limitation, reasonable fees of counsel) for all matters relating to the DIP Facility and DIP Financing Documents (whether incurred prior to or after the Petition Date).  For expense reimbursements in excess of $25,000, the DIP Agent shall provide copies of any such invoices to the Debtors, United States Trustee, and Committee (if any) who shall have five (5) business days to object to the payment of such fees.  Any fees not subject to such an objection may be paid to the DIP Agent.<br><br>*See* DIP Term Sheet "Fees and Expenses", Interim Order ¶6. |
| **Events of Default** | The DIP Term Sheet incorporates events of default customary for DIP financing arrangements, including, without limitation, events of default for failure to comply with the approved Budget and failure to adhere to sale process milestones.<br><br>*See* DIP Term Sheet "Events of Default". |
| **Stay Relief:** | The automatic stay is modified to the extent necessary to allow the DIP Agent to consummate the DIP Facility.  Further, the Interim Order incorporates automatic stay relief in favor of the DIP Agent to exercise remedies against collateral following an event of default, and the transmission of notice of such event of default to the Debtors, United States Trustee, and counsel for the Committee (if any), subject to such parties' rights to obtain injunctive relief preventing the exercise of remedies within 5 days of transmission of the default notice.  The Interim Order authorizes the DIP Agent to immediately cease further advances, terminate the DIP Facility, and terminate use of all DIP Facility collateral |

| | |
|---|---|
| | (including cash collateral), which rights are not subject to any restraint on remedies or further injunctive relief.<br><br>*See* DIP Term Sheet "Conditions Precedent" and "Remedies", Interim Order ¶¶12, 17, 18. |
| **No Other Borrowing or Cash Collateral Use / No Filing of a Plan that Cannot Repay DIP Financing:** | So long as the DIP Facility remains outstanding, the Debtors shall not seek any other cash collateral usage or postpetition financing that would not repay the DIP Facility, in full, in cash.<br><br>The filing or support of a bankruptcy plan that does not provide for repayment in full, in cash, of the Debtors' postpetition financing obligations constitutes an event of default under the Debtors' proposed DIP Facility.  Termination of the Debtors' plan exclusivity shall also constitute an event of default under the Debtors' proposed DIP Facility.<br><br>*See* DIP Term Sheet "Events of Default", Interim Order ¶16. |
| **Compliance with Sale Milestones:** | The DIP Term Sheet requires the Debtors to comply with certain milestones centered around a sale of substantially all of the Debtors' assets, including: (i) designating a stalking horse bidder and filing a sale procedures motion on the petition date; (ii) entry of a Court order approving the sale procedures within 21 days of the Petition Date; (iii) conducting an auction for substantially all of the Debtors' assets within 48 days of the Petition Date; (iv) obtaining entry of a Court order approving such sale within 50 days of the Petition Date; and (v) closing a sale of substantially all of the Debtors' assets within 10 days of entry of the sale order.<br><br>The Bankruptcy Court may set dates with respect to the sale milestones beyond the outer dates specified to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the sale milestones shall be automatically extended by the same period as the Bankruptcy Court's extension<br><br>*See* DIP Term Sheet "Sale Process" and "Events of Default", Interim Order ¶17. |
| **Payment and Application of 363 Sale Proceeds:** | The DIP Term Sheet, Interim DIP Order, and Final DIP Order shall provide that all proceeds from the sale of substantially all of the Debtors' assets shall be paid directly to the DIP Agent, for application to the Debtors' pre-petition and post-petition secured obligations.<br><br>*See* DIP Term Sheet "Application of 363 Sale Proceeds", Interim Order ¶¶21, 22. |
| **Indemnity:** | The Debtors shall indemnify and hold DIP Agent, the DIP Lender, and their officers, directors, employees, attorneys, and agents (including all of their professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in any way connected with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. The DIP Term Sheet incorporates the terms and conditions of <u>Section 16.5</u> of the Pre-Petition Credit Agreement.<br><br>*See* DIP Term Sheet "Indemnification". |

7

7.     As a condition to obtaining the proposed DIP Facility, the DIP Agent and the DIP Lender have agreed with the Debtors to certain provisions that may be considered significant provisions to be highlighted to the Court and the parties in interest for purposes of the Court's complex procedures for chapter 11 cases (such provisions, the "Complex Case Disclosure Provisions").[2] These provisions include:

| Application of Collections: | Collections from accounts receivable and other rights to payment will be applied first to the reduction of the Pre-Petition Obligations, before any reduction of DIP financing obligations. <br><br> *See* DIP Term Sheet "Pre-Petition Obligations", Interim Order at ¶ 22. |
|---|---|
| Validity of Liens/Release of Debtor Claims: | The liens and claims of the Pre-Petition Agent and Pre-Petition Lender shall not be subject to challenge, and shall be deemed valid claims secured by valid, perfected, first priority liens upon substantially all of the Debtors' assets, unless an interested party (i) commences an adversary proceeding challenging the liens or claims of the Pre-Petition Agent or Pre-Petition Lender within forty-five (45) days of the Petition Date; and (ii) obtains a final, non-appealable order substantiating such challenge action. <br><br> Subject to the rights of other interested parties to commence a challenge action, the Debtors and their bankruptcy estates shall release all claims and causes of action that they have against the Pre-Petition Agent, Pre-Petition Lender, and each of their affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that any of the Debtors may hold against such released parties. <br><br> *See* DIP Term Sheet "Lien Validation and Perfection" and "Release of Claims", Interim Order at ¶¶ 25-28. |
| Section 506(c) Waiver and other Collateral Matters: | Subject to entry of the Final Order: <br><br> (i) the Debtors shall waive any right to surcharge the prepetition collateral or DIP Collateral, whether pursuant to Bankruptcy Code sections 506(c) or 105(a) or under any other applicable law; and <br><br> (ii) the Agent, DIP Lender, Pre-Petition Agent, and Pre-Petition Lenders shall not be subject to the "equities of the case" exception of Bankruptcy Code section 552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine with respect to any DIP Collateral or collateral securing the Pre-Petition Credit Facility. <br><br> *See* DIP Term Sheet "506(c) Surcharge", Interim Order at ¶ 15. |
| Super-Priority Administrative Expense: | The DIP Agent, on behalf of the DIP Lender, is granted super-priority administrative expense status with respect to the Post-Petition Obligations under the DIP Term Sheet, with, among other things, priority over administrative expenses of the kinds specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code. |

---

[2] The descriptions provided here are only a summary of the significant provisions of the Post-Petition Financing. Please refer to the Post-Petition Financing Term Sheet and the proposed Interim Order for exact terms and conditions.

| | *See* DIP Term Sheet "Super-Priority Administrative Claim", Interim Order at ¶ 5. |
|---|---|

8.      The explanation for the inclusion of these Complex Case Disclosure Provisions is that without such Complex Case Disclosure Provisions, the DIP Lender would be unwilling to provide the DIP Facility, and as a result, the Debtors would not be able to access needed liquidity provided by the DIP Facility.  Indeed, the Debtors have been unable to obtain post-petition financing on any other basis.

9.      Each of the provisions of the DIP Facility outlined above are reasonable and appropriate under the facts and circumstances of these Chapter 11 Cases.  The Debtors negotiated the DIP Facility at arms' length and have determined that it is the best proposal under the circumstances.  Further, the DIP Facility is essential to the Debtors' ability to preserve their business operations and proceed successfully in these Chapter 11 Cases.  The terms outlined above—as well as the other terms and conditions of the Post-Petition Financing Term Sheet—are required terms of the DIP Facility.

10.      The Pre-Petition Agent, on behalf of the Pre-Petition Lender, holds a blanket first priority lien against the same assets that are the subject of the post-petition Liens granted under the Interim Order (the "Post-Petition Liens").  The Debtors do not believe that any other party holds a valid senior lien against such property.  Accordingly, the Post-Petition Liens are consistent in scope with the Pre-Petition Liens.  Moreover, and to the extent other parties may be affected by the Post-Petition Liens, their interests are adequately protected because the DIP Facility allows the Debtors to continue their business operations, generate new accounts receivable through such operations, and preserve and enhance the overall value of the Debtors' estates for the benefit of all parties. In all events, the DIP Facility provides a Challenge Period for interested parties to review and challenge the Pre-Petition Obligations and the Pre-Petition

Liens, such that the features of the DIP Facility do not insulate the Pre-Petition Obligations and the Pre-Petition Liens or the prepetition acts of the Pre-Petition Agent and the Pre-Petition Lender from any examination.

## BACKGROUND

### I.      The Chapter 11 Cases

11.      On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

12.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

13.      To date, no creditors' committee has been appointed in the Chapter 11 cases by the Office of United States trustee for the Southern District of Texas (the "U.S. Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.

14.      Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, their restructuring activities, and the events leading to the Debtors' decision to file the Chapter 11 Cases, is set forth in detail in the First Day Declaration.

### II.     The Debtors' Pre-Petition Corporate and Capital Structure

15.      Prior to the Petition Date, the Debtors were parties to that certain Revolving Credit, Term Loan and Security Agreement dated as of March 25, 2015 (such agreement, as amended, the "Credit Agreement", and together with all other documents, instruments, and agreements delivered in connection with the Credit Agreement, the "Pre-Petition Loan Documents") with PNC Bank, N.A. ("PNC") as agent (in such capacity, the "Pre-Petition

Agent") and as lender (in such capacity, the "Pre-Petition Lender").   A copy of the Credit

Agreement is attached hereto as Exhibit C.   As of July 5, 2016, the Debtors were indebted to the

Pre-Petition Agent and Pre-Petition Lender under the Pre-Petition Loan Documents in an amount

of not less than $35,776,284. Payment of the Debtors' obligations under the Pre-Petition Loan

Documents is also guaranteed by the Debtors' affiliates RDT Intermediate Holdco LLC, RDT

Brazil I LLC, and RDT Brazil II LLC (the "Guarantors").   The obligations of the Debtors and the

Guarantors under the Credit Agreement and other Pre-Petition Loan Documents collectively

constitute the "Pre-Petition Obligations."   The Pre-Petition Obligations are secured by valid,

enforceable, properly perfected, first priority, and unavoidable liens on and security interests (the

"Pre-Petition Liens") on substantially all assets of the Debtors, as set forth in the Credit

Agreement and Pre-Petition Loan Documents (the "Pre-Petition Collateral").

16.     The Debtors' remaining capital structure is described in the First Day Declaration.

17.     During the months before filing these Chapter 11 Cases, the Debtors had

continuous discussions and negotiations with the Pre-Petition Lender and the Pre-Petition Agent,

regarding the financing of a sale or restructuring both out-of-court and through a chapter 11

filing.  The Pre-Petition Lender's proposed terms for post-petition financing were consistent with

the market for similarly situated companies and the current restructuring market.

18.     To further test the market for post-petition financing, the Debtors also spoke with

two other parties regarding potential post-petition financing.  One of the parties had had initially

expressed an interest in being both a stalking horse buyer and a post-petition lender and

performed extensive diligence through the asset sale process conducted by the Debtors' financial

advisors.  As a result, this party was very familiar with Debtors, their assets, and their current

financial position.  However, near the end of their due diligence, this party elected to make neither a proposal to acquire the Debtors' assets nor a DIP financing proposal.

19.     The Debtors had discussions with one other party who expressed an interest in providing DIP financing.  Unfortunately, this party appeared very late in the process, and their primary interest was only in providing the DIP financing and not in purchasing the Debtors' assets.  Although this second party understood that the Pre-Petition Lender was likely to oppose alternative post-petition financing that might prime their existing pre-petition debt (something confirmed by the Debtors in discussions with the Pre-Petition Lender), the party continued to express an interest to providing the Debtors' post-petition financing.  In spite of these expressions of interest, this second party never provided the Debtors with a term sheet, and so the Debtors did not continue to pursue this alternative.

20.     Taking all of their circumstances into consideration, the Debtors concluded that the only likely source of post-petition financing available to them was from their existing secured lender.  This conclusion, combined with an agreement by the Pre-Petition Lender to make certain concessions, including that the proposed fee associated with the DIP Facility would not be paid unless the Pre-Petition Obligations were repaid in full, further improved the economic terms of the proposed financing.

21.     The Debtors' continued negotiations with the Pre-Petition Lender resulted in an agreement to provide the DIP Facility in accordance with the terms and conditions of the DIP Term Sheet (as defined below) and the Interim Order.  After making a considerable effort to market-test post-petition financing alternatives, the Debtors believe that the DIP Facility is the best (possibly only) post-petition financing available to them at this time.

22.     The Debtors have a critical need for the post-petition financing provided under the DIP Facility. The Debtors have ongoing business operations that generate significant operating expenses.  During the prepetition period, the Debtors' businesses suffered from the effects of the downturn in the oil and gas industry.  With the Debtors' customers placing fewer orders and some difficulties in collecting payment on pre-existing orders, the Debtors' account collections (all of which are the collateral of the Pre-Petition Lender) have not be sufficient to meet critical operating expenses at the time such expenses had to be paid (such as payroll for the Debtors' employees), and the Debtors have suffered recurring cash shortfalls.  The Debtors have been actively marketing their businesses and their assets for some time prior to the Petition Date, but they need financing to provide sufficient liquidity and adequate cash flow to maintain the stability of their operations until they can consummate a sale.

23.     The DIP Facility will provide the Debtors the liquidity they need to preserve the value of their businesses as going concerns, pending the approval and consummation of a sale of their assets. The DIP Facility will provide advances in an aggregate amount of up to three million dollars ($3,000,000).  These advances are subject to compliance with the budget agreed upon by the Debtors and the DIP Lender (the "Budget") and other terms set out in the Post-Petition Financing.  A copy of the initial approved Budget is attached hereto as **Exhibit D**.

24.     In short, the DIP Facility provides the Debtors (a) the liquidity and continued borrowing capacity that is essential to meet their operating expenses and to maintain stable business operations, (b) a financing platform from which the Debtors can assure employees, vendors, and other parties of their ability to maintain operations and meet their post-petition expenses, and (c) the necessary time for management to focus their attention on managing the

13

Debtors' operations in the post-petition environment pending the proposed sale of the Debtors' assets and a successful exit from chapter 11.

## APPLICABLE AUTHORITY

**I.      The DIP Facility Should be Approved.**

**A.      The Terms of the DIP Term Sheet Are Fair, Reasonable, and Appropriate.**

25.      As discussed in detail above, the DIP Facility is essential to the success of these Chapter 11 Cases, and the Debtors believe that the terms and conditions of the DIP Facility are fair, reasonable, and appropriate under the circumstances.  Among other things, the Debtors believe the interest rate and other economic terms of the DIP Facility are very favorable to the Debtors.

26.      The DIP Facility provides an ability (subject to the Budget) for the Debtors to borrow funds for payment of ongoing professional and other case administration claims, and the Interim Order provides for the Carve-Out for Professional Fees.  Such carve outs generally "preserve the adversary system" by ensuring that the committees and the debtor's estate are adequately assisted by counsel. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S,D.N. Y, 1990).  The Carve-Out protects against administrative insolvency during the course of the Chapter 11 Cases by ensuring that some assets remain for the payment of United States Trustee fees and certain professional fees of the Debtors, notwithstanding the Post-Petition Liens and superpriority administrative claims provided for under the Post-Petition Financing.

27.      As discussed above, the DIP Facility provides the Debtors with essential liquidity they need to operate their businesses during the Chapter 11 Cases.  The Debtors' request for interim authorization of the DIP Facility seeks authority to access funds under the DIP Facility to avoid immediate and irreparable harm to the value of the Debtors' assets in accordance with

14

Rules 4001(b)(2) and 6003 of the Bankruptcy Rules and the provisions of the Complex Case Procedures.

28.     The DIP Facility will be used by the Debtors to fund reasonable and necessary business expenses—expenses that will allow the Debtors to continue business operations and preserve value for creditors—all in accordance with the Budget.  The Budget itemizes the sources and uses of cash and provides a projection of cash receipts and expenditures. The Budget includes a list of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtors' business operations.  The DIP Facility and the Interim Order also provide parameters for certain variances from the Budget that are adequate to give the Debtors the operational flexibility they need.

29.     After conducting a thorough analysis, the Debtors and their advisors have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment in considering whether to approve the debtor's request to obtain post-petition financing.  *See, e.g*., *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (quoting order approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc*. , 115 B.R. at 40 (The court should defer to debtor's "reasonable business judgment. . . so long as the financing agreement does not. . . leverage the bankruptcy process" and its purpose is to benefit the estate rather than another party-in-interest.).

30.     The Debtors exercised their reasonable business judgment in determining that the DIP Facility is the best financing option available under the present circumstances, and the Debtors have satisfied the legal requirements to incur the obligations arising under the DIP

Facility Financing on the terms and conditions set forth therein.  The Debtors believe that the DIP Term Sheet and the Interim Order contain terms that are fair, reasonable, and in the best interests of the Debtors and their estates.  Accordingly, the Debtors respectfully submit that they should be authorized to enter into the transactions contemplated by the DIP Term Sheet and the Interim Order and obtain access to funding under the DIP Facility on the terms described therein.

### B.   The Debtors Should Be Authorized to Obtain Post-petition Financing on a Senior Secured and Superpriority Basis.

31.     Section 364 of the Bankruptcy Code allows a debtor to obtain (a) unsecured credit in the ordinary course of business, (b) unsecured credit outside the ordinary course of business, (c) credit with specialized priority or with certain security interests, and (d) secured credit by granting a senior or *pari passu* lien on already encumbered property. In other words, section 364 is "structured with an escalating series of inducements. . ." that may be offered to attract post-petition financing.  *Sapir v. CPQ Colorchrome Corp, (In re Photo Promotion Assocs. , Inc.)*, 87 B.R. 835, 839 (Bankr. S.D,N.Y. 1988), aff'd, 881 F.2d 6 (2d Cir. 1989).  Accordingly, if a debtor cannot obtain post-petition financing on an unsecured basis under sections 364(a) and (b), the bankruptcy court may authorize a debtor to obtain post-petition financing on a superpriority administrative expense basis pursuant to section 364(c), secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.

32.     Courts consider various factors in determining whether a debtor may obtain post-petition financing under section 364(c) of the Bankruptcy Code, including whether (i) the debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is necessary to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable and adequate given the circumstances of the debtor-borrower and the proposed lender, (iv) entry into the financing constitutes an exercise of the debtor's sound and reasonable business judgment,

and (v) the financing was negotiated in good faith and at arm's-length between the debtor and the lender. *In re Farmland Indus., Inc*, , 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003); *see also In re Aqua Assocs.* , 123 B.R. 192, 195-96 (Bankr. E.D, Pa. 1991) (applying factors 1-3).

33.   To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v, Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir, 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id*.  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.* , 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom*., *Anchor Savs. Bank FSB v, Sky Valley, Inc.* , 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

34.   The Debtors' assets (including their accounts receivable) are fully encumbered under the Pre-Petition Loan Documents; accordingly the Debtors cannot procure sufficient debtor in-possession financing in the form of either unsecured credit under sections 364(a) or (b) of the Bankruptcy Code, solely in exchange for the grant of an administrative expense or superpriority administrative expense claim, or on a junior lien basis under section 364(c) of the Bankruptcy Code.  No potential lenders were willing to commit to post-petition financing on such terms.

35.     The Debtors believe the terms of the DIP Facility are reasonable and beneficial; the Debtors do not believe they could obtain debtor-in-possession financing on more favorable terms from other sources.  *See, e.g.*, *Bray v. Shenandoah Fed. Savs. & Loan Ass'n*, 789 F.2d at 1088 (Section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

### C.     The Debtor Should Be Authorized to Obtain Post-petition Financing Secured by Priming Liens on Accounts.

36.     If the incentives available under Section 364(c) are insufficient to attract post-petition financing, a bankruptcy court may authorize post-petition credit under section 364(d) secured by a senior or *pari passu* lien on encumbered property (*i.e.*, a "priming" lien) without consent from the affected lienholders if (i) the debtor cannot otherwise obtain credit and (ii) the interests of the existing lienholders are adequately protected.  *See* 11 U. S.C. ( 364(d)(1); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (listing the above factors and also requiring that the "credit transaction" be "necessary to preserve assets of the estate").

37.     The Debtors conducted an extensive analysis of the post-petition financing options available to them and ultimately determined that the Pre-Petition Agent and Pre-Petition Lender offered the best available option for obtaining post-petition financing.  In fact, no potential lenders would be willing to provide post-petition financing without senior liens on the Debtors' assets, which is not feasible in light of the existing senior Pre-Petition Liens securing the Prepetition Obligations.  Because the Pre-Petition Agent and Pre-Petition Lender already hold first position liens on the Debtors' assets (including accounts receivable), and the DIP Facility explicitly provides that it shall not prime validly perfected, prepetition liens that are senior to the liens of the Pre-Petition Lender (if any), the priming liens to be granted under the

DIP Facility are not prejudicial to other interested parties here.  The Pre-Petition Agent, on behalf of the Pre-Petition Lender, already holds a first position lien on accounts receivable, and the DIP Facility allows the Debtors to continue to operate and generate new accounts receivable. The Debtors, therefore, do not believe that any existing creditors are harmed by the granting of such priming liens.

## II.    Modification of the Automatic Stay is Warranted.

38.    The DIP Facility will provide for modification of the automatic stay to allow the Post-Petition Agent and Post-Petition Lender to enforce its rights if there is an Event of Default. *See* Interim Order at ¶ 12.  Stay modification provisions of this sort are ordinary features of post-petition financing arrangements, and, in the Debtors' business judgment, are reasonable under the circumstances.  *See, e.g*., *In re MPF Holdings US LLC*, Case No. 08-36084 (Bankr. S.D. Tex, Feb. 18, 2009) (final order modifying automatic stay); *see also In re United Retail Grp., Inc*., Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 22, 2012); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (Bankr. S.D.N.Y. Jan. 25, 2012); *In re InSight Health Servs., Holdings Corp.*, Case No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011); *In re General Growth Props. Inc*., Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc*., Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009).

## III.    The Debtors Require Immediate Access to the Post-Petition Financing.

39.    The Court may grant interim relief in respect of a motion filed pursuant to Bankruptcy Code sections 363(c) or 364 where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't*

*Stores*, 115 B.R. at 36, 35.  The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, which allows the Debtors to immediately access DIP Loans under the DIP Facility, is not granted promptly after the Petition Date.  The Debtors have insufficient cash to fund operations without immediate access to the DIP Facility.  Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will immediately increase the Debtors' immediate cash needs as a result of, among other things, the costs of administering the Chapter 11 Cases, addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of the cases and making the payments authorized by other orders entered granting the Debtors' first day motions.

40.      Accordingly, the Debtors have an immediate need for access to the DIP Facility on an interim basis to, among other things, continue the operation of their business, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers, fund the costs of these Chapter 11 Cases, and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain enterprise value for the benefit of all parties in interest.

41.      The importance of a debtor's ability to secure post-petition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this and other districts in similar circumstances.  *See, e.g*., *In re North Bay Gen. Hosp. , Inc*., Case No, 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving post-petition financing on an interim basis); *In re MPF Holding US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 3, 2009) (same); *see also In re United Retail Grp., Inc*., Case No, 12-10405 (Bankr, S.D.N.Y. Feb, 2, 2012) (order approving post-petition financing on an interim basis); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (Bankr. S.D.N.Y. Mar. 16, 2011) (same); *In re Great Atl. & Pac. Tea Co*., Case

No. 10-24549 (Bankr. S.D.N.Y. Dec. 13, 2010) (same); *In re The Reader's Digest Assoc.*, Case No. 09-23529 (Bankr. S.D.N.Y. Aug. 26, 2009) (same). Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under Bankruptcy Rule 4001(b) and (c).

**IV.     The Debtors Request a Final Hearing on this Motion.**

42.     Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court set a date that is no later than 25 days after the Petition Date as a final hearing for consideration of entry of the Final Order.

43.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the parties listed below in the Notice section. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

44.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

21

## NOTICE

45.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the DIP Agent and the DIP Lender; (c) the parties listed in the consolidated list of forty (40) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; (d) all other parties listed in the notice paragraph of the Interim Order; and (e) any such other party entitled to notice pursuant to the Local Rules.  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

46.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Motion and enter the Interim Order in the form attached hereto, schedule a final hearing to consider entry of a Final Order, and grant such other and further relief as may be just and proper.

Dated: July 6, 2016
   Houston, TX

         Respectfully submitted,

         */s/ Elizabeth M. Guffy*
         Elizabeth M. Guffy
         Texas State Bar No. 08592525
         Brooke B. Chadeayne
         Texas State Bar No. 24072030
         Omer F. Kuebel, III
         Federal Bar No. 32595
         LOCKE LORD LLP
         600 Travis Street, Suite 2800
         Houston, TX 77002
         Telephone: 713-226-1200
         Facsimile: 713-223-3717
         E-mail:  eguffy@lockelord.com
              bchadeayne@lockelord.com
              nobankecf@lockelord.com

         **PROPOSED COUNSEL FOR RDT USA, LLC,**
         ***ET AL.***

## CERTIFICATE OF SERVICE

   The undersigned certifies that this Motion was served electronically on July 6, 2016 via ECF those parties registered to receive ECF service.

         */s/ Elizabeth M. Guffy*
         Elizabeth M. Guffy

23