## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| IN RE: | § | Chapter 11 |
| | § | |
| **ROTARY DRILLING TOOLS USA LLC,** | § | Case No.  16-33433 |
| *et al.*, | § | |
| | § | **Joint Administration requested** |
| Debtors.[1] | § | |

### DECLARATION OF BRYAN M. GASTON, CHIEF RESTRUCTURING OFFICER OF ROTARY DRILLING TOOLS, LLC, *ET AL.*, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Bryan M. Gaston, hereby declare:

1.      I am Chief Restructuring Officer ("CRO") of Rotary Drilling Tools USA, LLC ("RDT"), one of the above-captioned debtors, and its subsidiaries, including the other debtors, Tubular Repair, LLC, Rotary Drilling Holdings IV, LLC, and Pipe Coatings International LLC (collectively with RDT, the "Debtors").  In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, capital structure, organization, financial affairs, legal and regulatory matters, and books and records.

2.      On the date of this declaration (the "Petition Date"), RDT and three of its subsidiaries each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Concurrently with the filing of this declaration, the Debtors have filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1]   The Debtors in these cases, along with the last four digits of their respective taxpayer ID numbers, are Rotary Drilling Tools USA, LLC (5265), Tubular Repair, LLC (1136), Rotary Drilling Holdings IV, LLC (3309), and Pipe Coatings International LLC (2057).

3.     I submit this declaration (the "First Day Declaration") to provide an overview of the facts and circumstances surrounding these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "First Day Motion," and collectively, the "First Day Motions").  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management team and advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth in it.

4.     As set forth in more detail below, the Debtors' revenues have suffered significantly from the drastic decline in oil and gas prices and the generally depressed state of the energy industry.  The deterioration in the Debtors' business resulted in a default under the Debtors' existing secured credit facility and made it very difficult to pay trade creditors.  The Debtors have taken steps to reduce their costs, including staff reductions, site closures, reduction in hours of operation, and vendor renegotiations.  These measures, however, proved insufficient to overcome the Debtors' financial difficulties.

5.     In February and March 2016, as a condition to receiving relief under its secured credit facility through a forbearance agreement, the Debtors were required to retain a CRO and investment bank respectively to assist them in continued cost reduction initiatives, liquidity enhancement and in evaluating their strategic alternatives.

6.     Management and its restructuring advisors performed an evaluation of the market demand for the Debtors' products and services as well as their financial condition.  The results of

this evaluation combined with very limited liquidity led to the conclusion that an orderly sale of the Debtors' assets was the best strategic alternative to preserve and maximize value for the Debtors and their constituents.

7.     To familiarize the Court with the Debtors and the relief they will seek on the first day of these chapter 11 cases, this First Day Declaration is organized into three parts. Part I describes the Debtors' corporate history, business operations, prepetition organizational structure and capital structure. Part II describes the events that led to the Debtors' chapter 11 filings, and Part III sets out the relevant facts in support of the Debtors' First Day Motions.

## I.     The Debtors' Corporate History, Assets, Business Operations, and Prepetition Organizational Structure and Capital Structure.

### A.     Corporate History

8.     In 2006 RDT and its subsidiaries began to manufacture, repair, and process products for both drilling oil and gas wells and well completions. The Debtors manufacture products at their principal location in Beasley, Texas, and have repair centers in Odessa, Texas; Rifle, Colorado; Williston, North Dakota; and Evanston, Wyoming. The Beasley and North Dakota properties are owned; all others are leased.

### B.     Assets

9.     The Debtors' assets are comprised primarily of real estate and related improvements, machinery and equipment, drill pipe inventory and intellectual property.

### C.     Business Operations

10.     Collectively, the Debtors form a vertically integrated oilfield manufacturing company providing products in both the drilling and Oil Country Tubular Goods ("OCTG") arenas. For the past three years, they have been marketing and selling the majority of their products to oilfield rental companies for use primarily in the US land market. The oilfield rental

3

companies in turn present and rent the products to end users and contractors alike. Within the past eighteen months, the Debtors have begun selling OCTG products to rigs via distributors.

11. The Debtors' position in the market during the past three years has been the second link in a chain composed of steel mills, manufacturers and fabricators, rental companies and other distributors, and owners and operators of drilling rigs. This market position makes the business very susceptible to cyclicality of the US land rig count and is also driven largely by commodity pricing. Rig count has declined considerably during the industry downturn in the oil and gas market that began approximately 24 months ago.. The decline in the oil and gas industry and rig count has been compounded by deterioration in other key business drivers such as steel prices. Taken together, these market factors have had an extremely negative effect on the Debtors' revenues.

**D.      Prepetition Organizational Structure**

12. The Debtors' corporate organization is set out on the chart attached to this Declaration as Exhibit A.

**E.      Prepetition Capital Structure**

13. Prior to the Petition Date, the Debtors were parties to a Revolving Credit, Term Loan and Security Agreement dated as of March 25, 2015, with PNC Bank, N.A. ("PNC") as agent and as lender. This credit facility was a refinancing of the Debtors' previous credit facility with Amegy Bank.

14. As of July 5, 2016, the Debtors were indebted to PNC in an amount of not less than $35,776,284, plus prepetition interest, fees, expenses, and other amounts. Payment of the Debtors' obligations under the PNC credit facility is also guaranteed by the Debtors' affiliates RDT Intermediate Holdco LLC, RDT Brazil I LLC, and RDT Brazil II LLC. The Debtors'

obligations to PNC are secured by first priority liens on, and security interests in, substantially all assets of the Debtors.

## II.     Events Leading to the Filing of Chapter 11 Cases

15.     In June 2015, the Debtors broke financial covenants in their Prepetition Loan Documents.  As a result, they began a series of negotiations aimed at relieving the financial pressure on their businesses with a focus on reducing their overall cost structure.  As part of this effort, significant cost reduction measures were taken, which yielded annualized savings of approximately $16.2 million.  These measures included reductions in the Debtors' executive staff, site closures, hourly reduction, and vendor renegotiations.

16.     The Debtors' management team then initiated a comprehensive sales effort focusing on active drillers and distributors.  Unfortunately, market conditions continued to erode and the Debtors' reduction in their break-even operating costs was insufficient to withstand these depressed market conditions.  These conditions continued in late 2015 and into to early 2016.

17.     As indicated previously, the Debtors retained Bryan M. Gaston of Opportune LLP in February 2016 to serve as CRO.  The Debtors also secured a forbearance agreement with their secured lender, PNC, in March 2016.  As a condition to the forbearance, PNC also required that the Debtors retain an investment banking firm; Piper Jaffray & Co., through its Simmons & Company division, was retained in March 2016 as a result of this requirement.

18.     The Debtors no longer generate sufficient cash from sales and service of their products to meet their expenses and debt obligations.  The Debtors have been cash flow negative since late 2015.

## III.     Evidentiary Support for First Day Motions.

19.     As discussed above, the Debtors have filed for protection under chapter 11 with the goal of effecting the sale of their operating assets as a going concern at the highest and best

price available under the current market conditions and thereafter liquidating their remaining assets for the benefit of their creditors. To accomplish this, concurrently with the filing of their chapter 11 petitions, the Debtors have filed several First Day Motions, which seek relief the Debtors believe is critical to enable them to continue operations with as little disruption as possible, thereby preserving the Debtors' going concern value. The requested relief is also necessary to ensure the Debtors' smooth transition to operations under chapter 11 and to stabilize the Debtors during the bankruptcy process.

20.     I have reviewed the facts set forth in each of the First Day Motions discussed below, and those facts are true and correct to the best of my knowledge and belief, with appropriate reliance on the Debtors' officers, employees, and advisors. Capitalized terms used, but otherwise defined in this section shall have the meanings ascribed to them in the applicable First Day Motions.

**A.      Emergency Motion for Interim and Final Orders (i) Authorizing Secured Post-Petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. §§ 363, 364, and 507(B); (ii) Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362; (iii) Granting Related Relief; and (iv) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "DIP Financing Motion").**

21.     The Debtors are requesting authorization on an interim and final basis to incur post-petition financing as set out in the DIP Financing Motion. The approval of the post-petition financing is crucial to the Debtors' continued operations and the preservation of the value of their assets for all creditors and parties in interest. The DIP Financing Motion and the exhibits attached to it describe in the terms of the proposed post-petition financing. I hereby adopt and incorporate the description from the DIP Financing Motion as if fully set out in this Declaration.

22.     The Debtors are seeking the entry of an interim order authorizing them to incur post-petition indebtedness to the DIP Lender on an interim basis pursuant to an approved budget. The Debtors have no liquidity and will be unable to make payroll or fund operations to the

closing of a sale without access to the proposed interim post-petition financing. Thus, approval of the post-petition financing on an interim basis is vital to the Debtors' survival and the preservation of the value of their assets on a going-concern basis.

23. The proposed DIP Financing will be used to fund the Debtors' ongoing operations and the administrative expenses of these chapter 11 cases. I believe that the relief requested in the DIP Financing Motion, including the authorization to incur post-petition indebtedness immediately on an interim basis, is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest. Access to the post-petition financing immediately will allow the Debtors to continue operations with as little disruption or interruption as possible. Accordingly, I submit on behalf of the Debtors that the relief requested in the DIP Financing Motion should be granted.

**B.      Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>").**

24. The Debtors seek the entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b). As part of that joint administration, the Debtors ask that the Court maintain a single docket for all of the Chapter 11 Cases under the case filed by RDT. To avoid confusion, the Debtors further ask that the Court direct the entry of a notice on the docket in each of the Chapter 11 Cases other than that of RDT that reflects the joint administration of these cases.

25. Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will allow the Debtors significant administrative convenience without impairing the substantive rights of any creditor or party in interest. The majority of the motions, hearings, notices, and order in these Chapter 11 Cases will affect all of the Debtors and their creditors. The Court's approval of joint administration will reduce fees and costs by eliminating

duplicative filings and objections, as well as duplicative service of those pleadings.  It will also allow the U.S. Trustee and all other parties in interest to monitor these Chapter 11 Cases more easily and efficiently.

26.    I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and other parties in interest and that it will decrease the burden and expenses of the Debtors and other participants in these Chapter 11 Cases.  For these reasons, I respectfully submit that the relief requested in the Motion should be granted.

**C.**    **Debtors' Expedited Motion for Order (i) Authorizing the Debtors to (A) File a Consolidated List of Creditors and a Consolidated List of the Debtors' Forty Largest Unsecured Creditors and (B) Provide Notices, Including Notices of Commencement of Cases and Section 341 Meeting; and (ii) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Motion to Approve Notice Procedures and Extend Time").**

27.    The Debtors have filed a motion seeking approval of certain notice procedures and to extend the time to file their schedules of assets and liabilities and their statements of financial affairs.  The purpose of this motion is to reduce the administrative burden on the Debtors while still providing effective notice to creditors and parties in interest and to allow the Debtors additional time to prepare and file accurate schedules and statements of financial affairs.  I have reviewed the Motion to Approve Notice Procedures and Extend Time, and I am familiar with the procedures described in the Motion.

28.    There are a large number of creditors and parties in interest who may be entitled to notice in these Chapter 11 Cases under the Bankruptcy Rules.  Serving all of the documents in these Cases on all of these parties would be very expensive and time-consuming.  To avoid these burdens, the Debtors are requesting that the Court limit notice to the parties on the Debtors'

Master Service List, which would be established and maintained in accordance with the procedures for complex chapter 11 cases in the Southern District of Texas.

29.     The Debtors are requesting that notice be limited to the Master Service List for all matters covered by Bankruptcy Rule 2002, with the exception of (a) notice of (i) the first meeting of creditors under Section 341 of the Bankruptcy Code, (ii) the time fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c), (iii) the time fixed for filing objections to, and the hearings to consider, approval of a disclosure statement and the confirmation of a chapter 11 plan, and (iv) the time fixed for filing objections to, and the hearing to consider any motion seeking approval of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code or any bid procedures or related relief with respect to such a sale transaction, and (b) notice and transmittal of ballots for accepting or rejecting a chapter 11 plan. Notice of these listed excepted matters would still be given under the provisions of Bankruptcy Rule 2002, unless otherwise ordered by the Court or required by the Bankruptcy Code.

30.     The Motion to Approve Notice Procedures and Extend Time also requests that the Court (a) authorize the Debtors to file a consolidated creditor matrix and a consolidates list of the 40 largest general unsecured creditors and (b) approve the form and manner of the notice to be given of the commencement of these Chapter 11 Cases and the scheduled meeting of creditors under Section 341 of the Bankruptcy Code.

31.     The Debtors have been operating their businesses in a very integrated manner. Requiring them to convert their existing records in to separate matrices for each Debtor would be burdensome on the Debtors' remaining employees and likely to produce duplicate entries that would result in creditors and other parties receiving multiple notices or copies of the same documents.  By maintaining a consolidated matrix, all creditors and parties in interest will

receive the same notices that they would otherwise, without unnecessary and confusing duplication and without the unnecessary cost and burden to the Debtors' estates.

32.     The Motion to Approve Notice Procedures and Extend Time further seeks an additional 12 days for the Debtors to file their schedules of assets and liabilities and their statements of financial affairs (the "Schedules and SOFA").  This extension would allow the Debtors a total of 26 days from the Petition Date to file their Schedules and SOFA, and this request is made without prejudice to seeking an additional extension, if necessary.

33.     The Debtors collectively have a large number of creditors and parties in interest, generated by their business operations in several locations extended across several states.  Their employees are currently working to assemble the information needed to complete the Schedules and SOFA, but progress on this project has been delayed by the need for employees to simultaneously address other aspects of the Debtors' efforts to prepare for their chapter 11 filing and to stabilize the Companies' operations and their relationships with vendors and other creditors.

34.     The additional 12 days requested in the Motion will allow the Debtors' employees to give the necessary attention to the transition of the Companies' operations in to chapter 11 and will result in the filing of more accurate Schedules and SOFA.

35.     For all of the foregoing reasons, I believe that granting the relief requested in the Motion to Approve Notice Procedures and Extend Time is in the best interests of the Debtors and their estates, creditors, and other parties in interest.  I respectfully request that the Court enter an order granting that relief.

**D.     Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing (A) the Continued Use of Existing Cash Management System, Bank Accounts, Business Forms, and Deposit and Investment Practices; (B) Payment of Related Prepetition Obligations and (C) A Waiver Of Certain Operating Guidelines Relating To Bank**

**Accounts; And (Ii) Authorizing Continued Engagement in Intercompany Transactions Pursuant to 11 U.S.C. §§ 105(A), 345, and 363, Fed. R. Bankr. P. 6003 and 6004 (the "<u>Cash Management Motion</u>")**

36.     The Debtors have filed a motion to continue their ordinary course banking practices, including maintaining their current cash management system, continuing intercompany transfers, and the use of their current business forms.  The Cash Management Motion also seeks a waiver of certain of the US Trustee Guidelines with regard to debtor-in-possession bank accounts.

*Cash Management*

37.     I understand that, prior to the Petition Date, the Debtors maintained a cash management system designed to, among other things, efficiently collect, concentrate, invest and disburse the funds generated by the Debtors' business operations (the "<u>Cash Management System</u>").  The Cash Management System also enabled the Debtors to monitor the collection and disbursement of funds and control the administration of their bank accounts.

38.     The Debtors' personnel located at the Debtor's headquarters in Beasley, Texas, oversee cash receipt and disbursement activity in the Cash Management System.  By centralizing oversight of the Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor collections and approve disbursement of funds, while maintaining and preserving capital, and addressing the liquidity requirements of the Debtors.

39.     The Cash Management System is composed of eleven bank accounts (collectively, the "<u>Bank Accounts</u>"), a list of which is attached as Exhibit A to the Cash Management Motion, with PNC Bank and Amegy Bank (collectively, the "<u>Banks</u>"). A chart reflecting the flow of funds through the Bank Accounts in the Cash Management System is attached as Exhibit B to the Cash Management Motion. The following is an overview of the Cash Management System and related Bank Accounts.

(i)     Receipts.  The Debtors maintain two primary accounts a PNC Bank, a collection account and a disbursement account.  The majority of the Debtors' customer collections are paid directly into the PNC collections account and swept daily and applied to the Debtors' RBL revolving loan facility ("RBL") with PNC Bank the following day.  When funds are needed to pay employees and vendors in the ordinary course of business the Debtors initiate funding requests from PNC against the RBL, funds are then transferred into the Debtors' main disbursement account with PNC and payment is made by wire or check.    Additionally each Debtor maintains an account with Amegy Bank.    These accounts are largely as result of the Debtors' legacy credit facility with Amegy that was refinanced by PNC Bank in March 2015.  Although the Debtors have requested that customers remit payment to the PNC collections account select customers on occasion continue to remit payment into Amegy accounts (collectively, the "Checking Accounts").  When the balance of a Checking Account exceeds $10,000, the excess is swept into accounts at PNC Bank (collectively, the "Collection Accounts").    Proceeds of the Collection Accounts are automatically swept by PNC and applied to the RBL.  Excess funds are placed into an account at PNC Bank in the name of RDT (account no. xxxxxx3525, the "Funding Account") and transferred as needed into disbursement accounts at PNC Bank to fund the operating expenses of RDT, PCI and TR (collectively, the "Disbursement Accounts").  The Checking Accounts, Collection Accounts, Funding Account, and Disbursement Accounts are collectively referred to herein as the "Bank Accounts".

(ii)    Disbursements.  The Disbursement Accounts directly disburse funds for various purposes, including payroll, payroll taxes and employee benefits for non-management employees, as well as general corporate expenses for their respective Debtors.

*Intercompany Transactions and Intercompany Claims*

40.    In the ordinary course of business, RDT transfers money to other Debtors (the "Intercompany Transactions").  The Intercompany Transactions involve the transfer of funds between bank accounts owned by RDT and bank accounts owned by various affiliated Debtors. However, RDT maintains its books and records on an individual basis.

41.    The Debtors seek authority to continue the Intercompany Transactions postpetition.  Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, I understand that the Debtors may continue the Intercompany Transactions in the ordinary course, as contemplated by section 363(c)(1) of the Bankruptcy Code, without court approval.  Nonetheless, out of an abundance of caution, the Debtors seek express authority to continue engaging in the

Intercompany Transactions; provided, however that the Debtors will not engage in an Intercompany Transaction with a non-Debtor without first obtaining the prior, written consent of the Debtors' postpetition lender, PNC Bank, N.A.

42.     I believe that failure to continue the Intercompany Transactions in the ordinary course of the Debtors' business would unnecessarily and severely hinder operations. Intercompany Transactions are integral to payroll funding.  Absent the continuation of the Intercompany Transactions, the Debtors' ability to operate their primary business during the Chapter 11 Cases would be severely prejudiced, and their ability to maximize value for creditors would be drastically reduced.  I believe that continuing the Intercompany Transactions is, therefore, in the best interests of the estates and that the Court should authorize the Debtors to continue the Intercompany Transactions in the ordinary course of business.

*Business Forms*

43.     In the ordinary course of business, the Debtors use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials and other business forms and correspondence (collectively, the "Business Forms").  Given that the Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession.  I believe that most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding the Chapter 11 Cases and the notice of commencement of the Chapter 11 Cases that has been or will soon be provided to parties in interest.

44.     Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.  Therefore, I believe that the Court should approve the Debtors' continued use of their existing Business Forms.

13

*Waiver of Banking Requirements*

45.     The Debtors are sophisticated entities with a Cash Management System that relies on multiple banks and Bank Accounts on a daily basis.  The Debtors' Bank Accounts at Amegy Bank and PNC Bank are in financially stable banking institutions with FDIC insurance up to the applicable limit per account.  To the extent the funds in these Bank Accounts exceed FDIC insured limit, I believe that the safety presented by the banks constitutes sufficient cause pursuant to Bankruptcy Code section 345(b) to allow the Debtors to deviate from approved investment and deposit practices established by the Bankruptcy Code.  Additionally, I believe that it would be overly burdensome and impractical for the Debtors to direct their limited finance personnel to open and manage multiple accounts to keep funds in each account under the FDIC insured limit.  To force the Debtors to do so would critically harm the Debtors' ability to maintain its business operations, as the Debtors would have to access several accounts to pay payroll and accounts payable invoices which usually aggregate well over $100,000 in any given week.  I believe that forcing strict compliance with section 345 of the Bankruptcy Code would be unduly burdensome and distracting to the Debtors and, therefore it is in the best interests of the Debtors, their estates, and their creditors for the Court to approve this relief requested.

**E.     Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Wages and Employee Benefits; and (II) Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Wages and Benefits Motion").**

46.     The Debtors are requesting the authority, in their sole discretion, to pay prepetition claims, honor obligations, and to continue programs relating to the prepetition Employee Obligations (as defined in the Wages and Benefits Motion) in the ordinary course of business and as consistent with their past practices.  I have reviewed the Wages and Benefits Motion, and I am familiar with the programs and benefits described in it and the payments that

are made for such programs and benefits.  The descriptions of the programs and benefits set out in the Wage and Benefit Motion are, to the best of my knowledge, true and correct, and I adopt those descriptions for the purpose of making this Declaration.

47.     As of the Petition Date, the Debtors in the aggregate employed a total of approximately 44 employees, including both full time and part time employees, with some employees salaried and others paid on an hourly basis.

48.     Most of the Debtors' Employees rely exclusively on their compensation, benefits, and expense reimbursements to support themselves and their families.  If the Debtors are not authorized to honor their obligations as set out in the Wages and Benefits Motion, these Employees will experience significant financial hardship.  As a result, if the Debtors are not authorized to honor these obligations, the morale and loyalty of the Employees will be adversely affected.  This, in turn, will have a detrimental effect on the Debtors' business operations.  Over the past year, the Debtors have reduced their workforce to the minimum necessary to maintain orderly business operations and therefore need to keep all of their existing Employees on the job and focused.  Additionally, the Debtors would have difficulty replacing any Employees at this point.

49.     I believe that the relief requested in the Wages and Benefits Motion is reasonable and necessary and that granting that relief is in the best interests of the Debtors, their estates, and their creditors.  Without the requested authorization, the Debtors' business operations are likely to be disrupted and value of the Debtors' assets will be diminished.  Accordingly, I respectfully request on behalf of the Debtors that the Court grant the relief requested in the Wages and Benefits Motion.

**F.      Debtors' Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments (the "Utilities Motion")**

50.      The Debtors incur expenses for gas, water, sewer, electric, telecommunications, internet access, and other similar utility services in the ordinary course of their businesses.  It is essential to the Debtors' business operations and to the preservation of the value of their assets that there be no interruption of these critical services.

51.      The Debtors are seeking entry of interim and final orders (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance, (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order, and (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order.  The Debtors propose that no final hearing be held on the Utilities Motion unless a timely objection is filed and cannot be resolved by the parties.

52.      I believe and am advised that the procedures proposed in the Utilities Motion are necessary in these Chapter 11 Cases because, if they are not approved, the Debtors would be forced to address many separate demands by Utility Providers in a piece-meal manner during the first weeks of these cases.  Additionally, in the absence of the requested procedures, a Utility Provider could simply wait until on or after the thirtieth day after the Petition Date to decide to notify the Debtors that service would be terminated unless an unreasonable demand for adequate assurance was immediately met.  The proposed procedures not only ensure that the Debtors'

16

utility services are not interrupted and their business operations are not, as a result, disrupted, but also that all Utility Providers are treated equally and fairly.

53.     I believe that granting the relief requested in the Utilities Motion is in the best interests of the Debtors and their estates, creditors, and parties in interest and will allow the Debtors to continue their business operations with as little disruption as possible, thereby preserving the value of their assets.  For these reasons, I respectfully submit on behalf of the Debtors that the relief requested in the Utilities Motion should be granted.

**G.      Debtors' Emergency Application for Appointment of Kurtzman Carson Consultants, LLC as Claims, Noticing and Solicitation Agent Pursuant to 11 U.S.C. §§ 105(A), 345, and 363, Fed. R. Bankr. P. 6003 and 6004 (the "KCC Application")**

54.     The Debtors are seeking the entry of an order appointing Kurtzman Carson, LLC ("KCC") as claims and noticing agent in these Chapter 11 Cases.  I believe that such relief is prudent in light of the many hundreds of creditors, potential creditors and parties in interest to whom certain notices will be sent.

55.     I believe that KCC's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and of other developments in the Chapter 11 Cases. Moreover, I am informed that KCC has acted as the claims and noticing agent in numerous cases of comparable size.

56.     As more fully detailed in the KCC Application, I understand that KCC will engage in certain Claims and Noticing Services, including, but not limited to, transmitting, receiving, docketing and maintaining proofs of claim filed in connection with the Chapter 11 Cases.  KCC will also work with the office of the Clerk of the United States Bankruptcy Court for the Southern District of Texas to ensure that its methodology conforms with all of the Court's procedures, the Local Bankruptcy Rules and the provisions of any order entered by this Court.

57.     Accordingly, I believe that retention of KCC, an independent third party with significant experience in this role, to act as an agent of the Court, is in the best interests of the Debtors and their estates and creditors.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated:  July 7, 2016


_____
Bryan M. Gaston
Chief Restructuring Officer

# Exhibit A

# ROTARY DRILLING STRUCTURE CHART
## (as of February 16, 2015)



Top-level entities:

- [Wood Family Holdings, LLC]
- OGRS RDT, LLC
- OFS RDT LLC
- CSL Energy Opportunities Fund I, LP
- CSL Energy Holdings I, LLC

Ownership of **RDT Holdco LLC** (Delaware) (Managed by its Board of Managers)*:

- 4.02%
- 20.12%
- 37.93%
- 27.51%
- 10.429%

**RDT Holdco LLC** (Delaware) (Managed by its Board of Managers)*
— 100% —
**RDT Intermediate Holdco LLC** (Delaware) (Managed by its Managing Member, RDT Holdco LLC)

- Gregory Harris — 2.2500.00 Class B Units
- Thein Aung — 2.2500.00 Class B Units
- William Sealy Morris — 12,882.60 Class A Units
- RDT Incentive LLC — 10,000 Class C Units
- 72,617.40 Class A Units

**Rotary Drilling Tools USA, LLC** (Texas) (Managed by its Managing Member, RDT Intermediate Holdco LLC)
— 98.08% —

Subsidiaries:

- Rotary Drilling Tools Premium, LLC (Delaware) — 50%
- Pipe Coatings International LLC (Texas) — 100%
- Rotary Drilling Tools de Mexico S. de R.I. de C.V. (Mexico)
- Rotary Drilling Tools-Colombia, LLC (Delaware) — 50%
  - Great White Tubular Colombia, Ltd. (Columbia)
- Rotary Drilling Holdings IV, LLC (Delaware) — 100%
- Tubular Repair, LLC (Oklahoma) — 100%
- RDT Brazil II LLC (Delaware) — 100%
- RDT Brazil I LLC (Delaware) — 100%
  - Rotary Drilling Tools do Brazil Servicos em Tubulacao Ltda. (Brazil)

*Two managers are appointed by OFS RDT LLC; two managers are appointed by CSL Energy Opportunities Fund I, LP and CSL Energy Holdings I, LLC; one manager is appointed by OGRS RDT, LLC; and two managers are designated by William Sealy Morris.