**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| IN RE: | § | **Chapter 11** |
| | § | |
| **ROTARY DRILLING TOOLS USA LLC,** *e* | § | **Case No.  16-33433** |
| *al.*, | § | |
| | § | **Jointly Administered** |
| Debtors.1 | § | |

**AMENDED DISCLOSURE STATEMENT IN
<u>SUPPORT OF AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION</u>**

**THIS AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS SUBMITTED TO ALL CREDITORS AND INTEREST HOLDERS OF THE DEBTORS ENTITLED TO VOTE ON THE CHAPTER 11 PLAN OF LIQUIDATION SUBMITTED BY THE DEBTORS, HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE CONCERNING THE PLAN.  ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE ENTIRE DISCLOSURE STATEMENT AND PLAN WITH CARE.**

**ON SEPTEMBER [\*], 2016, THE BANKRUPTCY COURT CONDITIONALLY APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE.  SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN HEREIN DESCRIBED IS BEING SOUGHT FROM CREDITORS AND INTEREST HOLDERS WHOSE CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS ARE IMPAIRED UNDER THE PLAN.  <u>CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN ARE URGED BY THE DEBTORS TO VOTE IN FAVOR OF THE PLAN.</u>  WHEN YOU VOTE, PLEASE RETURN THE COMPLETED BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT IN THE ACCOMPANYING ENVELOPE ADDRESSED TO Kurtzman Carson Consultants, LLC, AT [\*], NOT LATER THAN [\*], 2016.**

**<u>THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS HAS EVALUATED THE PLAN FULLY SUPPORTS IT.  THE COMMITTEE URGES YOU TO VOTE IN FAVOR OF THE PLAN</u>.**

**THOUGH CONDITIONALLY APPROVED, A CREDITOR OR PARTY IN INTEREST MAY STILL OBJECT TO THIS DISCLOSURE STATEMENT OR OBJECT TO THE INFORMATION CONTAINED HEREIN ON OR BEFORE OCTOBER [\*], 2016, AT 5:00 P.M. CENTRAL TIME.   A HEARING ON FINAL APPROVAL OF THIS DISCLOSURE STATEMENT IS SET FOR OCTOBER _____.**

---

1   The Debtors in these cases, along with the last four digits of their respective taxpayer ID numbers, are Rotary Drilling Tools USA, LLC (5265), Tubular Repair, LLC (1136), Rotary Drilling Holdings IV, LLC (3309), and Pipe Coatings International LLC (2057).

**Locke Lord LLP**
Elizabeth M. Guffy
Brooke B. Chadeayne
600 Travis Street, Suite 2800
Houston, TX 77002
Telephone: 713-226-1200
Facsimile: 713-223-3717
E-mail:  eguffy@lockelord.com
         bchadeayne@lockelord.com
         nobankecf@lockelord.com

Omer F. Kuebel, III
601 Poydras Street, Suite 2660
New Orleans, LA  70130
Telephone:  504-558-5155
Facsimile:  504-681-5255
Email:   rkuebel@lockelord.com

**Counsel for the Debtors**

# TABLE OF CONTENTS

**Page**

ARTICLE 1

INTRODUCTION ........................................................................................1

1.1.  **General Information Concerning Disclosure Statement and Plan.**...................1

1.2.  **Disclaimers.**........................................................................................1

1.3.  **Answers to Commonly Asked Questions.** ............................................3

ARTICLE 2

OVERVIEW OF PLAN..............................................................................5

ARTICLE 3

THE DEBTORS..........................................................................................6

3.1.  **The Debtors' Prepetition Business and the Events Leading to Bankruptcy.** ...6

3.2.  **Significant Events during the Chapter 11 Case.** ...............................10

ARTICLE 4

CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN ...................................................................................................12

4.1.  **Administrative Claims and Priority Tax Claims.**  In accordance with § 1123(a)(l) of the Bankruptcy Code, certain Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.  These unclassified Claims are treated as follows: ..................................................................................12

ARTICLE 5

IMPAIRMENT OF CLASSES AND RESOLUTION OF CLAIM CONTROVERSIES..................................................................................13

5.1.  **Treatment of Unimpaired Classes.** .................................................13

5.2.  **Impaired Classes.** .............................................................................14

5.3.  **Controversy Concerning Classification, Impairment or Voting Rights.** ........14

ARTICLE 6

TREATMENT OF CLAIMS AND EXECUTORY CONTRACTS ...................15

6.1.  **Treatment of Unimpaired Classes.** .................................................15

6.2.  **Treatment of Impaired Classes.**......................................................15

ARTICLE 7

MEANS OF IMPLEMENTATION..............................................................15

7.1.  **Substantive Consolidation of the Debtors.**....................................15

7.2.  **Approval of the PNC Settlement and Release** ................................16

7.3.  **The Holdback Amount** .....................................................................16

7.4.  **Creation of Liquidating Trust.** ........................................................17

ARTICLE 8

CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF
DISPUTED CLAIMS/INTERESTS AND PROCEDURES FOR
ASSERTING CLAIMS ........................................................................17

8.1.  **Objection Process.** ....................................................................17

8.2.  **Filing of Claims and Causes of Action.** ...................................17

ARTICLE 9

EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................18

ARTICLE 10

EFFECT OF CONFIRMATION .......................................................................18

10.1.  **Legally Binding Effect.** ...........................................................18

10.2.  **Limited Protection of Certain Parties in Interest.** ..................18

10.3.  **[Reserved]** ...............................................................................19

10.4.  **Preservation and Retention of Claims and Rights.** ................19

ARTICLE 11

CONFIRMATION OF THE PLAN ..................................................................19

11.1.  **Confirmation Hearing.** ............................................................19

11.2.  **Statutory Requirements for Confirmation of the Plan.** ...........20

11.3.  **Cramdown.** ..............................................................................22

11.4.  **Conditions Precedent to Effective Date.  Unless waived, the following
         conditions are necessary before the Effective Date:** .............23

11.5.  **Annulment of Plan if Conditions Not Waived or Satisfied.** .....24

11.6.  **Retention of Jurisdiction by Bankruptcy Court.** .....................24

ARTICLE 12

MISCELLANEOUS PROVISIONS ..................................................................24

12.1.  **Bar Date for Administrative Claims.** ......................................24

12.2.  **Objections to Administrative Claims.** .....................................25

12.3.  **Payment of Professional Claims.** ............................................25

12.4.  **Payment of United States Trustee Fees.** ..................................25

12.5.  **Employee Benefits Plans.** ........................................................25

12.6.  **Amendment of the Plan.** ..........................................................25

12.7.  **Timing of Distributions.** ..........................................................25

12.8.  **Withdrawal of Plan.** ................................................................26

12.9.  **Substantial Consummation.** ....................................................26

12.10.  **Conflict.** .................................................................................26

12.11.  **Severability.** .......................................................................................26

12.12.  **Setoffs.** ..............................................................................................26

12.13.  **Other Considerations.** ........................................................................26

12.14.  **Alternative Plans of Liquidation.** .......................................................27

12.15.  **Liquidation under Chapter 7.** .............................................................27

12.16.  **Risk Factors.** ......................................................................................28

12.17.  **Taxation.** ............................................................................................28

ARTICLE 13
            CAUSES OF ACTION ...............................................................31

13.1.   **Preferences.** ........................................................................................31

13.2.   **Fraudulent Transfers.** .........................................................................31

13.3.   **Other Causes of Action.** ......................................................................32

ARTICLE 14
            VOTING PROCEDURES AND REQUIREMENTS ..................................33

14.1.   **Ballots and Voting Deadline.** ...............................................................33

14.2.   **Creditors Entitled to Vote.** .................................................................33

14.3.   **Voting Procedures.** .............................................................................34

14.4.   **Vote Required for Class Acceptance.** ...................................................34

14.5.   **Cramdown.** ..........................................................................................34

5178208v2

# ARTICLE 1
## INTRODUCTION

**1.1.    General Information Concerning Disclosure Statement and Plan.**

The Debtors submit this Disclosure Statement, as may be amended from time to time, under § 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to all of the Debtors' known Creditors and Interest Holders entitled to vote on the Debtors' Amended Chapter 11 Plan of Liquidation (the "Plan"). The purpose of this Disclosure Statement is to provide adequate information to enable Creditors and Interest Holders who are entitled to vote on the Plan to arrive at a reasonably informed decision in exercising their respective right to vote on the Plan. A copy of the Plan is included with this Disclosure Statement. Capitalized terms used but not defined in this Disclosure Statement shall have the meanings assigned to them in the Plan or in the Bankruptcy Code and Bankruptcy Rules. All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Debtors have proposed the Plan consistent with the provisions of the Bankruptcy Code. The purpose of the Plan is to create a liquidating trust to liquidate the Debtors' remaining assets, including the prosecution of causes of action, and then distribute the proceeds to Creditors in accordance with the priorities set out in the Bankruptcy Code. After the Debtors' remaining assets have been transferred to the liquidating trust, the Debtors will be dissolved. The Debtors believe that the Plan provides for the maximum recovery available for all Classes of Claims and Equity Interests.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Equity Interests under the Plan. It is submitted as an aid and supplement to your review of the Plan and to explain the terms of the Plan. Every effort has been made to fairly summarize the Plan and to inform Creditors and Interest Holders how various aspects of the Plan affect their respective positions. You are encouraged to consult with your own counsel. Counsel for the Debtors are, and Counsel for the Official Committee of Unsecured Creditors may be, available to answer any questions that your counsel may have regarding the Plan and this Disclosure Statement.

**1.2.    Disclaimers.**

**NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE. NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTORS TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT, ANY ATTACHMENTS THERETO AND THE PLAN.**

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATION CONCERNING THE DEBTORS, THEIR ASSETS, THEIR LIABILITIES, PAST OR FUTURE OPERATIONS, OR CONCERNING THE PLAN**

ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE IMMEDIATELY REPORTED TO COUNSEL FOR THE DEBTORS.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION PROVIDED HEREIN WAS OBTAINED FROM A VARIETY OF SOURCES AND IS BELIEVED TO BE RELIABLE.  HOWEVER, THE DEBTORS HAVE NOT BEEN ABLE TO INDEPENDENTLY VERIFY EACH AND EVERY STATEMENT CONTAINED HEREIN.  ACCORDINGLY, THE DEBTORS AND THEIR PROFESSIONALS CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THE DEBTORS' BUSINESS AFFAIRS ARE COMPLEX.  IT IS POSSIBLE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN COULD HAVE NEGATIVE TAX AND OTHER ECONOMIC CONSEQUENCES.  THE DEBTORS MAKE NO REPRESENTATIONS REGARDING THE TAX IMPLICATIONS OF ANY TRANSACTION CONTEMPLATED UNDER THE PLAN.  IT IS NOT UNCOMMON FOR PARTIES TO RETAIN THEIR OWN TAX ADVISORS TO ANALYZE THE PLAN.  THE DEBTORS ENCOURAGE ALL PERSONS THAT MIGHT BE AFFECTED TO SEEK INDEPENDENT ADVICE REGARDING THE TAX EFFECTS OF THE PLAN.

DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE DEBTORS OR THEIR PROFESSIONALS THAT THE PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE LIQUIDATION OF THE DEBTORS' ASSETS OR THAT ALL POTENTIAL ADVERSE EVENTS HAVE BEEN ANTICIPATED.

THE CONDITIONAL APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT IS NOT FINAL.  SUCH CONDITIONAL APPROVAL DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.  A PARTY IN INTEREST MAY STILL OBJECT TO THIS DISCLOSURE STATEMENT BEFORE THE DEADLINE OF [*], 2016.

THIS DISCLOSURE STATEMENT AND THE PLAN SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.  FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THE TERMS OF THE PLAN

**ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

**1.3.    Answers to Commonly Asked Questions.**

As part of the Debtors' efforts to inform Creditors and Interest Holders regarding the Plan and the Plan confirmation process, the following summary provides answers to questions which parties who receive a disclosure statement often ask.

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

### 1.3.1   Who are the Debtors?

The Debtors in these cases, along with the last four digits of their respective taxpayer ID numbers, are Rotary Drilling Tools USA, LLC (5265), Tubular Repair, LLC (1136), Rotary Drilling Holdings IV, LLC (3309), and Pipe Coatings International LLC (2057).  The nature of the Debtors' business and the major events in this bankruptcy case are described below in Article 3.

### 1.3.2   What is a Chapter 11 bankruptcy?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their assets in a controlled fashion.   The Debtors are proposing to liquidate all of their assets.   The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed.  During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the Court orders the appointment of a trustee which did not occur in this case.

### 1.3.3   If the Plan governs how my Claim or Interest is treated, what is the purpose of this Disclosure Statement?

The Bankruptcy Code requires that in order to solicit votes on a bankruptcy plan, the proponent of the plan must first prepare a disclosure statement that provides sufficient information to allow creditors and interest holders to make an informed decision about the plan. The disclosure statement and plan are distributed to creditors and interest holders only after the Bankruptcy Court has approved the disclosure statement and determined that the disclosure statement contains information adequate to allow creditors and interest holders to make an informed judgment about the plan.  At that time, creditors and interest holders whose claims and interests are impaired under the Plan also receive a voting ballot and other materials.

### 1.3.4   Has this Disclosure Statement been approved by the Bankruptcy Court?

On September [*], 2016, the Bankruptcy Court conditionally approved this Disclosure Statement as containing adequate information.   Such conditional approval is subject to final approval and objections may be raised to the substance herein.   The Court may deny final approval of the disclosure statement notwithstanding conditional approval.   "Adequate information" means information of a kind, and in sufficient detail, as far as is practicable

considering the nature and history of the Debtors, to enable a hypothetical investor typical of holders of claims or interests of the relevant classes to make an informed judgment whether to vote to accept or reject the Plan. The Bankruptcy Court's conditional approval of this Disclosure Statement does not constitute an endorsement of any of the representations contained in either the Disclosure Statement or the Plan. Final approval of the disclosure statement will be considered at the confirmation hearing and objections timely filed before the objection deadline will be considered at that time.

### 1.3.5   How do I determine how my Claim or Interest is classified?

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest. Under the Plan, Claims and Interests are classified into a series of classes. The pertinent articles and sections of the Disclosure Statement and Plan disclose, among other things, the treatment that each class of Claims or Interests will receive if the Plan is confirmed.

### 1.3.6   Why is confirmation of the Plan important?

The Bankruptcy Court's confirmation of the Plan is a condition to the Debtors carrying out the treatment of Creditors and Interest Holders under the Plan. Unless the Plan is confirmed, and any other conditions to confirmation or to the effectiveness of the Plan are satisfied, the Debtors are legally prohibited from satisfying Claims or Interests as provided in the Plan. <u>Put more simply, confirmation of a plan in chapter 11 is required before the Debtors can begin making payments to prepetition Creditors.</u>

### 1.3.7   What is necessary to confirm the Plan?

Under applicable provisions of the Bankruptcy Code, confirmation of the Plan requires that, among other things, at least one class of impaired Claims or Interests vote to accept the Plan. Acceptance by a class of claims or interests means that at least two-thirds in the total dollar amount and more than one-half in number of the allowed Claims or Interests actually voting in the class vote in favor of the Plan, with all votes of insiders excluded from acceptance. Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims/interests. Besides acceptance of the Plan by a class of impaired creditors or interests, a bankruptcy court also must find that the Plan meets a number of statutory tests before it may confirm the Plan. These requirements and statutory tests generally are designed to protect the interests of holders of impaired claims or interests who do not vote to accept the Plan but who will nonetheless be bound by the Plan's provisions if the bankruptcy court confirms the Plan.

Because at least one of the classes under the Plan is deemed to reject the Plan, the Debtors are requesting that the Bankruptcy Court confirm the Plan under § 1129(b) of the Bankruptcy Code. To confirm a plan not accepted by all classes, the plan proponent must demonstrate that the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and that has not accepted, the plan. This method of confirming a plan is commonly called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the plan itself also provides for certain conditions that must be satisfied as conditions to confirmation.

### 1.3.8   Is there a Committee in this case?

Yes.  The Committee has seven members:  MC Tubular Products, Inc., SMS Technical Services LLC, Emerald Metals, LLC, Tubular Mill Inspections, LLC, Heating Induction Services, Venom Inspection Services and Hunting Energy Services, Inc.   The role of the Committee is established by the Bankruptcy Code.  It acts as a participant in the case for the benefit of unsecured creditors as a group and has the right to appear and be heard.

Counsel for the Official Committee of Unsecured Creditors is Christopher D. Johnson at McKool Smith, P.C. 600 Travis, Suite 7000, Houston Texas 77002.  Mr. Johnson may be reached at 713-485-7315.

### 1.3.9   When is the deadline for returning my ballot and objecting to the Disclosure Statement and Plan?

The Bankruptcy Court has directed that, to be counted for voting purposes, your ballot must be received by the Debtors' counsel by October [*], 2016.  A Creditor or Party in Interest may file with the Bankruptcy Court a written objection to the Disclosure Statement or Plan before the deadline of October [*], 2016.  If an objection is not timely filed, it may not be considered.

**IT IS IMPORTANT THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE ON THE PLAN.  THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO CREDITORS AND INTEREST HOLDERS.  THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS AND RECOMMEND THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE TO ACCEPT THE PLAN.**

**THE COMMITTEE HAS REVIEWED THE PLAN AND RELATED TRANSACTIONS AND HAS DETERMINED THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF UNSECURED CREDITORS.  THEREFORE, THE COMMITTEE RECOMMENDS THAT UNSECURED CREDITORS SUBMIT THEIR VOTE IN FAVOR OF THE PLAN.**

### ARTICLE 2
### OVERVIEW OF PLAN

2.1.    An overview of the Plan is set forth below.  This overview is qualified in its entirety by reference to the Plan.  If the Bankruptcy Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

2.2.    The Plan contemplates the substantive consolidation of the Debtors' bankruptcy estates for purposes of voting and distribution.  Substantive consolidation means that, only for purposes of voting on the Plan and distribution to creditors, the Debtors will be treated as a single entity.  The assets of all of the Debtors will be combined and paid on an equal basis to the creditors of all of the Debtors.  Additionally, all intercompany debts will be extinguished.

2.3.    Since the filing of their chapter 11 cases, the Debtors have sought and approved court

5178208v2

approval of a sale of substantially all of their operating assets.  The Net Sale Proceeds, less the Holdback Amount, were paid to PNC and applied first to the Debtors' postpetition obligations to PNC under the DIP Order and then to the PNC Prepetition Secured Claims.  The Holdback Amount has been made available to the Debtors to pay their operating expenses incurred prior to the Effective Date.  Additionally, Administrative Claims and Priority Claims will be paid from the Holdback Amount.  After payment of these expenses and Claims, the Residual Holdback Amount will be paid to PNC and applied to the remaining amount of the PNC Prepetition Secured Claims.

2.4.    Under the Plan, the Debtors' remaining assets, including the North Dakota Property, the Vehicle Allowance, the Subsidiary Equity Interests, all other assets not sold through the court-approved sale, and all causes of action, shall vest in the Liquidating Trust, free and clear of all liens, claims and encumbrances, except as otherwise provided in the Plan.  The Liquidating Trustee will have the authority to object to the allowance of any claims filed against the Debtors. The Liquidating Trustee will prosecute causes of action in his or her discretion, liquidate other remaining tangible assets, and make distributions to creditors in accordance with the Bankruptcy Code and the Plan.

2.5.    The Plan's terms incorporate a settlement negotiated between the Debtors and the Committee, on the one hand, and PNC, the Debtors' secured lender, on the other.  Under the terms of this settlement, PNC has agreed to (a) make the Holdback Amount available to pay the Allowed Administrative Claims (other than the PNC Adequate Protection Administrative Claim) and the Allowed Priority Claims, (b) not assert a security interest in the North Dakota Property or the Vehicle Allowance, (c) accept 50% of any value realized through the Subsidiary Equity Interests, and (c) accept the payment of $200,000 in satisfaction of its right to an adequate protection payment under the DIP Order, which will be payable only once the Liquidating Trust has received at least $1,500,000.  In exchange, the Debtors and the Committee have agreed to (a) the amount, priority, and validity of PNC's prepetition liens, and (b) the full release of PNC from any claims that could be asserted against it.  Confirmation of the Plan will also constitute approval of this settlement.

## ARTICLE 3
## THE DEBTORS

### 3.1.    The Debtors' Prepetition Business and the Events Leading to Bankruptcy.

#### 3.1.1    The Debtors' Prepetition Business.

In 2006 RDT and its subsidiaries began to manufacture, repair, and process tubular products (including drill and casing pipe) for both drilling oil and gas wells and well completions.  The Debtors manufactured products at their principal location in Beasley, Texas, and had repair centers in Odessa, Texas; Rifle, Colorado; Williston, North Dakota; and Evanston, Wyoming.  The Debtors owned the real properties located at Beasley, Texas and Williston, North Dakota; all other locations were leased by the Debtors.

Collectively, the Debtors form a vertically integrated oilfield manufacturing company providing products in both the drilling and Oil Country Tubular Goods ("OCTG") arenas.  For the past three years, they have been marketing and selling the majority of their products to oilfield rental companies for use primarily in the US on shore market.  The oilfield rental

companies in turn present and rent the products to end users and contractors alike.  Within the past eighteen months, the Debtors have begun selling OCTG products to rig owners via distributors.

The Debtors' position in the market during the past three years has been the second link in a chain composed of steel mills, manufacturers and fabricators, rental companies and other distributors, and owners and operators of drilling rigs. This market position makes the business very susceptible to cyclicality of the US land rig count and is also driven largely by commodity pricing.  Rig count has declined considerably during the industry downturn in the oil and gas market that began approximately 24 months ago..  The decline in the oil and gas industry and rig count has been compounded by deterioration in other key business drivers such as steel prices. Taken together, these market factors have had an extremely negative effect on the Debtors' revenues.

The Debtors' corporate organization is set out on the chart attached as **Exhibit 1**.

### 3.1.2   **Debtors' Financial Information.**

Prior to the Petition Date, Rotary Drilling Tools USA, LLC was the borrower under a Revolving Credit, Term Loan and Security Agreement dated as of March 25, 2015, with PNC as agent and as lender.  The other Debtors—Tubular Repair, LLC, Pipe Coatings International, LLC, and Rotary Drilling Holdings IV, LLC—guaranteed that indebtedness to PNC.  Payment of the Debtors' obligations under the PNC credit facility is also guaranteed by the Debtors' affiliates RDT Intermediate Holdco LLC, RDT Brazil I LLC, and RDT Brazil II LLC. This credit facility was a refinancing of the Debtors' previous credit facility with Amegy Bank.

As of July 5, 2016, the Debtors were indebted to PNC in an amount of not less than $35,776,284, plus prepetition interest, fees, expenses, and other amounts.  The Debtors' obligations to PNC are secured by first priority liens on, and security interests in, substantially all assets of the Debtors.  The Committee investigated the debt to PNC and liens PNC asserts against the Debtors assets and believes that the Debtors' estates have potential claims against PNC in connection with its prepetition loans to the Debtors.  However, the Committee has agreed to the release of PNC from these claims as part of the settlement with PNC set out in the Plan.

The Debtors file monthly operating reports with the Bankruptcy Court which reflect current financial information and are publicly available for inspection at the office of the Clerk of the Court.  Attached hereto as **Exhibit 2** are copies of the latest monthly operating reports filed by the Debtors.

### 3.1.3   **Events Leading to Bankruptcy.**

The Debtors' revenues suffered significantly from the drastic decline in oil and gas prices and the generally depressed state of the energy industry.  The deterioration in the Debtors' business resulted in a default under the Debtors' existing credit facility with PNC and made it very difficult to pay trade creditors.  The Debtors have taken drastic steps to reduce their costs, including staff reductions, site closures, reduction in hours of operation, and vendor renegotiations.  These measures, however, proved insufficient to overcome the Debtors' financial difficulties.

In June 2015, the Debtors were in breach of certain financial covenants in their Prepetition Loan Documents.  As a result, they began a series of negotiations with PNC aimed at relieving the financial pressure on their businesses with a focus on reducing their overall cost structure.  As part of this effort, significant cost reduction measures were taken, which yielded annualized savings of approximately $16.2 million.  These measures included reductions in the Debtors' executive staff, site closures, hourly reduction, and vendor renegotiations.

The Debtors' management team then initiated a comprehensive sales effort focusing on active drillers and distributors.  Unfortunately, market conditions continued to erode and the Debtors' reduction in their break-even operating costs was insufficient to withstand these depressed market conditions.  These conditions continued in late 2015 and into early 2016.

By early 2016, the Debtors no longer generated sufficient cash from sales and service of their products to meet their expenses and debt obligations.  In February and March 2016, the Debtors sought relief under the secured credit facility with PNC through a forbearance agreement in order to obtain the continued funding needed to operate their businesses.  To that end, in February of 2016, the Debtors entered a Forbearance Agreement with PNC.  As a condition of the forbearance agreement, PNC required the Debtors to retain a chief restructuring officer or "CRO" and an investment bank to assist them in continued cost reduction initiatives and liquidity enhancement and in evaluating their strategic alternatives.  This requirement by PNC was met when the Debtors retained Bryan M. Gaston of Opportune LLP in February 2016 to serve as CRO and Piper Jaffray & Co., through its Simmons & Company division, in March 2016 to serve as investment banker.

The Debtors' management and restructuring advisors performed an evaluation of the market demand for the Debtors' products and services, as well as of their financial condition.  The results of this evaluation combined with the Debtors' very limited liquidity led to the conclusion that an orderly sale of the Debtors' assets was the best strategic alternative to preserve and maximize value for the Debtors and their creditor constituents.  After months of negotiations and marketing, the Debtors were finally able to come to terms with Vallourec Drilling Products USA, Inc. ("Vallourec"), which were incorporated in an asset purchase agreement (the "Vallourec APA").

As part of the terms of the Vallourec APA, Vallourec required that its purchase of the Debtors' assets be conducted through a sale under section 363 of the Bankruptcy Code.  Vallourec also agreed to serve as the stalking-horse bidder for purposes of a bidding and auction process once the Debtors' chapter 11 cases were filed.  Because of this requirement and because the Debtors believed that the protections of chapter 11 were best calculated to preserve and distribute value to their creditors, the Debtors commences these chapter 11 cases on July 6, 2016.

In preparation for their chapter 11 filing, the Debtors had reached an agreement with PNC under which PNC agreed to fund a post-bankruptcy debtor-in-possession loan ("DIP Loan") for the Debtors, with a principal amount of up to $3 Million.  Upon filing their chapter 11 cases, the Debtors sought approval of the DIP  Loan by the Bankruptcy Court as required under section 363 of the Bankruptcy Court.  The Bankruptcy Court approved the DIP Loan by final order (the "DIP Order") entered on August 12, 2016 at Docket No. 91.  Under the terms of the DIP Loan, PNC was granted liens on the Debtors' assets that are superior to all existing liens on those assets and was given priority over any other administrative expenses, as well as replacement liens and administrative expenses for adequate protection and the diminution of

value of collateral.  The precise terms of the DIP Loan are set forth in the DIP Order and accompanying loan documents available from http://www.kccllc.net/rdt.

### 3.1.4   The Debtors' Assets.

On the Petition Date, the Debtors' most valuable assets were comprised primarily of real estate and related improvements, machinery and equipment, drill pipe inventory and intellectual property.  On August 24, 2016, the Debtors filed with the Bankruptcy Court the Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules").  The Debtors filed amendments to certain of the Schedules on September [*], 2016.  The Schedules, as amended, contain a detailed listing of the Debtors' assets and the amounts owed to Creditors based on the Debtors' books and records.  In connection with this Disclosure Statement, Creditors and Interest Holders are referred to the Schedules.  Copies of the Schedules and the amended Schedules are available from the Clerk's office or at http://www.kccllc.net/rdt or the Counsel for the Committee.

### 3.1.5   Liabilities and Claims against the Debtors.

The Schedules, as amended, contain a detailed listing of Creditors, together with the estimated amount of Claims, and Creditors and Interest Holders are referred to the Debtors' Schedules for more information regarding the extent and nature of those Claims and Interests.  In addition, a number of proofs of claims have been filed in the Debtors' chapter 11 cases.  The bar date for filing proofs of claim was originally set as November 21, 2016.  However, on August 24, 2016, the Bankruptcy Court entered an order shortening the bar date for non-governmental entities to September 19, 2016 (Docket No. 124).

### 3.1.6   Secured Claims.

The Debtors' primary secured creditor, PNC Bank, N.A. ("PNC"), was owed not less than $35,776,284 as of the Petition Date.  Fuqua Construction Company has asserted a secured claim arising from an alleged mechanics and materialmen's lien in connection with work done on the Beasley, Texas, property in the approximate amount of $384,000.  The Debtors dispute that lien.

Some other creditors, including counterparties to capital leases, have also filed secured proofs of claim, and the Debtors continuing to review the alleged secured proofs of claims.  Any secured claims under capital leases will be satisfied either through assumption and assignment to the Purchaser or rejection of the lease and return of the leased equipment or other property.

### 3.1.7   Priority Claims.

A number of priority proofs of claim were scheduled and filed.  These claims are either wages owed to former employees or taxes owed to governmental units.  The Debtors dispute certain claims filed by former employees for prepetition bonuses.  These claims, which total approximately $340,000, are unsupported by the law and facts and greatly exceed the maximum priority claim allowed to an employee under Section 507(a)(4) of the Bankruptcy Code and are therefore subject to objection.

The remaining priority claims total approximately $62,000.  The Debtors continue to review these claims and reserve the right to object to them.

### 3.1.8   General Unsecured Claims.

Based on the claims register and the schedules, the estimated amount of unsecured claims have been asserted against the Debtors is $7,236,533.46.  This number does not include the PNC Deficiency Claim, which is estimated to be approximately $22,000,000, and may not include all tort claims, unliquidated claims or claims for rejection damages, and it likely includes a number of duplicate claims.  The Debtors expect that a significant number of unsecured proofs of claim will be subject to objection.  The Debtors are unable to predict the outcome of any anticipated claim objections that may be filed.

**THE RIGHT OF THE DEBTORS AND/OR THE LIQUIDATING TRUSTEE (WHETHER EXISTING OR FORMED UNDER THE PLAN) TO OBJECT TO ANY CLAIM FILED IN THIS CASE IS EXPRESSLY RESERVED.  THE INCLUSION OF A CLAIM OR CLAIMS WITHIN THIS DISCLOSURE STATEMENT IS NOT AN ADMISSION REGARDING THE VALIDITY OR ALLOWANCE OF ANY CLAIM. YOU SHOULD NOT ASSUME THAT A VOTE FOR OR AGAINST THE PLAN WILL HAVE ANY AFFECT OF THE STATUS OF YOUR CLAIM.**

### 3.2.   Significant Events during the Chapter 11 Case.

### 3.2.1   Bankruptcy Filing and First-Day Relief.

On July 6, 2016, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Bankruptcy Court held a first-day hearing on July 8, 2016.  Relief granted before or at the first-day hearing included joint administration of the Debtors' bankruptcy cases, authority to pay certain pre-petition wages of employees, procedures for providing adequate assurance to utility providers, authority to appoint a noticing agent, and extending time to file schedules and statements of financial affairs.  Shortly thereafter, the Bankruptcy Court granted authority to obtain post-petition financing and continued use of cash management systems.

### 3.2.2   DIP Financing.

On July 11, 2016, the Debtors obtained interim authority to borrow on a secured revolving credit facility of up to $3 million provided by the Debtors' pre-petition secured lender, PNC.  Ultimately, on August 2, 2016, the Debtors obtained final approval of the post-petition financing with PNC (the "DIP Loan").  The DIP Loan is secured by a priming lien on substantially all of the Debtors' assets.  For further details regarding the terms of the DIP loan, including the interest rate, maturity, and terms of repayment, please contact counsel for the Debtors or review the order approving the DIP loan on the KCC website.

The Committee raised certain objections to the proposed terms of the DIP Loan and the proposed order approving it (the "DIP Order").  Among these objections, the Committee opposed the provisions that would have allowed PNC to receive and apply all of the proceeds of the anticipated sale of the Debtors' assets.  As a compromise, the Committee and PNC agreed that there would be a holdback from the sales proceeds (the "Holdback Amount").  PNC and the Committee later reached an agreement that the Holdback Amount would include the estimated amounts needed to pay the Debtors' operational expenses through the Effective Date, the Allowed Administrative Claims, and the Allowed Priority Claims and to fund reserves for

disputed secured claims, disputed Priority Claims, and potential purchaser price adjustments (discussed in more detail below).

### 3.2.3   Retention of Professionals.

The Debtors have filed several applications to retain professionals.  These include the retention of (i) Bryan Gaston of the firm of Opportune, LLC as chief restructuring officer, (ii) Locke Lord LLP as general bankruptcy counsel, (iii) Piper Jaffray Simmons as investment bankers and (iv) Kurtzman Carson Consultants as claims, noticing, and solicitation agent.  The Bankruptcy Court has approved each of these retention applications

Additionally, the Committee has filed applications to retain McKool Smith, P.C. as counsel and Stout Risius Ross, Inc. as financial advisors.  The Bankruptcy Court has also approved both of these applications.

The Debtors estimate that, as of the Effective Date, the total amount of unpaid Administrative Expense, including professional fee expenses, will be approximately $1,461,406.

### 3.2.4   Claims Bar Date.

The deadline to file proofs of claim in these cases for non-governmental entities was September 19 2016.  The Debtors retained KCC as their claims and noticing agent, and the Debtors' claims register may be reviewed on the KCC website.

### 3.2.5   The Marketing and Sale Process.

The Debtors' management actively marketed its business and assets through late 2015.  Based upon the expressions of interest received, in early 2016, the Debtors presented a transaction structure proposed by Vallourec to PNC for the lender's consent.  However, PNC elected to test the market further, rather than to accept the offer presented by Vallourec.  Accordingly, as discussed above, PNC required the Debtors, as a condition of forbearance, to retain a third party marketing agent, Simmons.  Simmons assisted the Debtors in (a) drafting an offering document describing Debtors, their operations, historical performance, and future prospects; (b) identifying, contacting, and screening potential purchasers of the Debtors' assets or business; (c) contacting such potential purchasers; (d) preparing a due diligence data room and coordinating the due diligence investigations of potential purchasers; (e) analyzing proposals received from potential purchasers; and (f) negotiating the financial aspects of the proposed sale transaction.  This process culminated in the Debtors' execution of the APA with Vallourec as the proposed stalking horse bidder.

On August 3, 2016, the Court entered a bid procedures order setting August 19, 2016, as the deadline for interested parties to submit qualified bids.  Vallourec's stalking horse bid proposed a purchase price of $12 million and overbid protections.  The Debtors subsequently received qualified bids from two other entities—National Oilwell Varco and Aplicaciones Tubulares S.L.  The Debtors conducted an auction on August 23, 2016.  The winning bidder at the auction was Aplicaciones Tubulares S.L. (together with its designated assignee, the "Purchaser"), whose final bid was $22,155,076.00.

On August 24, 2016, the Court held a hearing to approving the sale of the Debtors' assets to the Purchaser and entered an order approving the sale on the same day.  The sale closed and funded on September 16, 2016.

In order to facilitate the closing of the sale, the Debtors and the Purchaser entered into a Transition Services Agreement, under which the Debtors agreed to provide certain services, including payroll and accounting, to the Purchaser post-closing, with the Purchaser obligated to reimburse the Debtors for their costs.  The Transition Services Agreement will terminate at confirmation.

Additionally, the Debtors and the Purchaser entered into a Closing Agreement to address the fact that some of the assets to be conveyed to the Purchaser remained in the hands of third parties.  The Closing Agreement allows the Debtors thirty days to deliver possession of these assets; otherwise, the Purchaser has the right to take an agreed-upon purchase price reduction for each of the assets not delivered.  The agreed-upon amount of these purchase price adjustments is included in the Holdback Amount; however, the Debtors anticipate that they will deliver possession of all of these assets to the Purchaser within the thirty-day time period.

Under the terms of the DIP Order and the Sale Order, the proceeds of the sale, less a holdback amount, were paid to PNC and applied first to repay PNC's Postpetition Secured Claims, with the remainder applied to PNC's Pre-Petition Secured Claim.  Under the settlement set out in the Plan, PNC has agreed to allow the Holdback Amount to be used to fund the Debtors' operating expenses through the Effective Date and to pay Allowed Administrative Claims and Allowed Priority Claims.

### 3.2.6   Lease/Contract Rejection.

Under the terms of the asset purchase agreement signed with the Purchaser, certain of the Debtors' executory contracts and leases were assumed by the Debtors and assigned to the purchaser.  The Plan provides that all other executory contracts and leases are to be rejected at confirmation.

In order to avoid incurring additional administrative expenses, the Debtors have filed a motion seeking authority to reject certain equipment leases with De Lage Landen Financial Services.  The Debtors are in the process of reviewing their remaining unexpired leases and executory contracts, and they may file additional motions to reject some of them prior to confirmation.

## ARTICLE 4
## CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN

The Claims against and Interests in the Debtors are classified as follows:

4.1.   **Administrative Claims and Priority Tax Claims.**  In accordance with § 1123(a)(l) of the Bankruptcy Code, certain Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article III.  These unclassified Claims are treated as follows:

4.1.1   **PNC Adequate Protection Administrative Claim.**   The PNC Adequate Protection Administrative Claim will be paid, by agreement with PNC, from the

first two hundred thousand dollars ($200,000) distributed by the Liquidating Trust in funds that are not subject to any lien asserted by PNC, after the Liquidating Trust has distributed a total of $1,500,000 in funds that are not subject to any lien asserted by PNC to holders of Allowed General Unsecured Claims.

4.1.2   **Other Administrative Claims**.  All other Allowed Administrative Claims arising under 11 U.S.C. § 503(b), will be paid in Cash and in full by the Liquidating Trustee from the Holdback Amount on the later of (i) the Administrative and Priority Tax Claims Distribution Date, (ii) the date on which such Administrative Claim becomes an Allowed Claim; or (iii) such other date as the Liquidating Trustee and the holder of the Allowed Administrative shall agree.  Allowed Administrative Claims that are not secured by a valid, perfected, post-petition Lien are not entitled to post-petition interest or legal fees and expenses.

4.1.3   **Priority Tax Claims**.  Priority Tax Claims will be paid in Cash and in full by the Liquidating Trustee from the Holdback Amount on the later of (i) the Administrative and Priority Tax Claims Distribution Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Claim; or (iii) such other date as the Liquidating Trustee and the holder of the Allowed Priority Tax Claim shall agree.

4.2.   **Classified Claims Against and Interests in the Debtors**.

The Claims against and Interests in the Debtors are classified as follows:

4.2.1   **Class 1 – PNC Prepetition Secured Claim**.  Class 1 is comprised of the Allowed PNC Prepetition Secured Claim.

4.2.2   **Class 2 – Miscellaneous Secured Claims**.  Class 2 is comprised of all Allowed Secured Claims against the Debtors, other than the Allowed PNC Prepetition Secured Claim.

4.2.3   **Class 3 – Priority Non-Tax Claims**.  Class 3 is comprised of all Allowed Priority Non-Tax Claims against the Debtors.

4.2.4   **Class 4 – General Unsecured Claims**.  Class 4 is comprised of all Allowed General Unsecured Claims against the Debtors.

4.2.5   **Class 5 – Equity Interests**.  Class 5 is comprised of all Allowed Interests in the Debtors.

## ARTICLE 5
## IMPAIRMENT OF CLASSES AND RESOLUTION OF CLAIM CONTROVERSIES

5.1.   **Treatment of Unimpaired Classes.**

Holders of Claims that are in unimpaired Classes are deemed to have accepted the proposed Plan and are not entitled to vote on the Plan.  Class 1 (PNC Prepetition secured Claim of PNC) and Class 2 (Miscellaneous Secured Claims) and Class 3 (Priority Non-Tax claims) are not impaired under this Plan.

5.1.1   **Class 1 – PNC Prepetition Secured Claim**.  **I**n full and final satisfaction of the PNC Prepetition Secured Claim, PNC shall receive (a) the Residual Holdback Amount, (b) fifty percent (50%) of all value received from the sale or other disposition of the Subsidiary Columbia Interests, and (c) at the election of PNC (i) the proceeds of all other Collateral securing the PNC Prepetition Secured Claim (including any proceeds of all other PNC Collateral that is transferred into, or held by, the Liquidating Trust), if any, and/or (ii) all other Collateral securing such PNC Prepetition Secured Claim (including any Collateral of PNC that is transferred into, or held by, the Liquidating Trust).

5.1.2   **Class 2 – Miscellaneous Secured Claims**.  In the sole discretion of the Liquidating Trustee, the holder of an Allowed Claim in Class 2 shall receive either (i) the proceeds of the Collateral (including, if applicable, the proceeds from the Asset Sale) securing such Claimant's Allowed Claim after satisfaction in full of all superior liens up to the Allowed Amount of the Claimant's Allowed Secured Claim; or (ii) the Collateral securing such Claimant's Allowed Secured Claim in full and final satisfaction of such Claim

5.1.3   **Class 3 – Priority Non-Tax Claims**..  Priority Non-Tax Claims will be paid in Cash and in full by the Liquidating Trustee from the Holdback Amount on the later of (i) the Administrative and Priority Claims Distribution Date, (ii) the date on which such Priority Non-Tax Claim becomes an Allowed Claim; or (iii) such other date as the Liquidating Trustee and the holder of the Allowed Priority Non-Tax Claim shall agree.

## 5.2.   **Impaired Classes.**

Only holders of Claims that are in impaired Classes may vote on the Plan.  The following Classes of Claims and Interests are impaired under the Plan:

5.2.1   Class 4 – General Unsecured Claims (entitled to vote)
5.2.2   Class 5 – Equity Interests (deemed to reject)

## 5.3.   **Controversy Concerning Classification, Impairment or Voting Rights.**

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, prior to the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy.  Without limiting the foregoing, the Bankruptcy Court may estimate for voting or distribution purposes the amount of any contingent or unliquidated Claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the Chapter 11 Cases.  In addition, the Bankruptcy Court may in accordance with § 506(b) of the Bankruptcy Code conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

## ARTICLE 6
## TREATMENT OF CLAIMS AND EXECUTORY CONTRACTS

**6.1.    Treatment of Unimpaired Classes.**

Allowed Claims in Class 3 will be paid in Cash and in full by the Liquidating Trustee from the Net Sales Proceeds on the later of (i) the Distribution Date, (ii) the date on which such Claim becomes an Allowed Claim; or (iii) such other date as the Liquidating Trustee and the holder of the Allowed Claim in Class 3 shall agree.  Allowed Claims in Class 3 are not entitled to post-petition interest or post-petition legal fees and expenses.

**6.2.    Treatment of Impaired Classes.**

6.2.1    **Class 4**   The Liquidating Trustee shall distribute Available Cash Pro Rata to holders of Allowed Claims in Class 4 and/or the Disputed Claims Reserve pursuant to on each Distribution Date.  The Liquidating Trustee shall have the right, but not the obligation, make interim distributions to holders of Allowed Claims in Class 4 from Available Cash on such interim Distribution Dates as the Liquidating Trustee determines appropriate.  In the event that any of Class 4 are paid in full and there exists remaining Available Cash, holders of Allowed Claims in such class shall receive interest at the Plan Rate.  As reflected in Exhibit 4, the projected distribution to Class 4 Claims is 3.7%, but the actual distribution amount cannot be predicted.

6.2.2    **Class 5**   All Equity Interests in Class 5 shall be canceled as of the Effective Date.  Class 5 is deemed to reject and the Plan will "cram down" the class under Bankruptcy Code Section 1129(b).

## ARTICLE 7
## MEANS OF IMPLEMENTATION

**7.1.    Substantive Consolidation of the Debtors.**

7.1.1    The entry of the confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors and their Estates for the purposes of voting, confirmation, and distribution under the Plan.  Solely for such purposes, on and after the Effective Date, (i) all assets and all liabilities of the Debtors and their Estates shall be deemed merged into Reorganized RDT, (ii) all guaranties of any Debtor of the payment, performance, or collection of any obligations of another Debtor shall be extinguished and cancelled, (iii) any obligation of any Debtor and all guaranties of such obligations executed by one or more of the Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, (v) all Claims between or among the Debtors shall be cancelled, an (vi) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.

7.1.2    The substantive consolidation effected pursuant to this section shall not affect (other than for purposes related funding distributions under the Plan), (i) the legal and organizational structure of the Debtors, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality in order to assert a right of setoff, and (iii) distributions out of any insurance policies or the proceeds of any such policies.

## 7.2.    Approval of the PNC Settlement and Release

7.2.1    As discussed earlier, the Debtors and the Committee, on the one hand, and PNC, on the other, have reached an agreement that will resolve all outstanding disputes between them.   Under the DIP Order, the Committee was given the right to investigate PNC's prepetition claims and liens, as well as any claims the Debtors may have had against PNC.   The Committee identified certain assets of the Debtors that it believed were not subject to a valid and perfected prepetition lien in favor of PNC.   These assets included the North Dakota Property, two vehicles with missing title certificates, and some of the Subsidiary Equity Interests. Additionally, the Committee believes that there are potential claims against PNC for fraudulent transfer in connection with the prepetition obligations to PNC incurred by the Debtors other than Rotary Drilling Tools USA, LLC.   PNC disputes the Committee's assertions regarding the extent and validity of its liens and any claims against PNC.

7.2.2    In order to avoid unnecessary legal expenses and to allow the Debtors to formulate a consensual chapter 11 plan, the Debtors, the Committee and PNC entered into negotiations that resulted in the settlement set out in the Plan.   The confirmation of the Plan will also approve the terms of the settlement, which include a full release of PNC.

## 7.3.    The Holdback Amount

7.3.1    As discussed earlier, the Sale Order provides that a certain amount—the Holdback Amount—would be reserved from the sales proceeds received by the Debtors. The Holdback Amount as negotiated among the Debtors, PNC, and the Committee totaled $5,329,550.24, consisting of  estimated amounts needed to pay the following:

(i)    amounts due at closing ($1,174,300), (b) the Debtors' operating expenses between the sale closing and the Effective Date of the Plan ($439,915.99),

(ii)    Administrative Claims other than PNC's claim for adequate protection ($2,211,400.00), (d) Priority Claims ($440,414.60),

(iii)    Secured Claims asserted by creditors other than PNC ($651,514.64),

(iv)    reserves for potential purchaser price adjustments under the Debtors' Closing Agreement with the Purchaser ($401,000.00), and

(v)     the agreed-upon value of the untitled vehicles ($50,000.00).

7.3.2   PNC asserts that the entire amount of the Holdback Amount constitutes its cash collateral.  However, under the terms of the settlement, PNC has agreed that the Holdback Amount will be available to pay the Debtors' operating expenses and to fund payment of Administrative Claims and Priority Claims under the Plan.  The Holdback Amount will also be available to pay any Allowed Secured Claim that is secured by the proceeds of the Asset Sale.  Other than the value attributed to the two vehicles, any portion of the Holdback Amount left after making these payments will be paid to PNC to reduce its Prepetition Secured Claim.

## 7.4.   **Creation of Liquidating Trust.**

On the Effective Date, the Liquidating Trust shall be created.  The Liquidating Trust shall be governed by the Liquidating Trust Agreement, the Plan and the Confirmation Order.  The terms of the employment of the Liquidating Trustee shall be set forth by filing the Liquidating Trust Agreement at least 10 days before the Confirmation Hearing, and as amended by the Confirmation Order.  On the Effective Date, the Debtors shall transfer the Holdback Amount, the Rights of Action, the Subsidiary Equity Interests, the North Dakota Property, and all other Excluded Assets, as defined in the Asset Purchase Agreement, and any other assets not sold to the Purchaser pursuant to the Asset Purchase Agreement.  All transfers to the Liquidating Trust shall be free and clear of all liens, claims, interests and encumbrances, subject only to the rights of holders of Allowed Claims as set forth in the Plan.  For federal income tax purposes, the transfer of the identified assets to the Liquidating Trust will be deemed to be a transfer to the holders of Allowed Claims (who are the Liquidating Trust beneficiaries), followed by a deemed transfer by such beneficiaries to the Liquidating Trust.

# ARTICLE 8
## CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF DISPUTED CLAIMS/INTERESTS AND PROCEDURES FOR ASSERTING CLAIMS

## 8.1.   **Objection Process.**

After the Effective Date, the Liquidating Trustee on behalf of the Liquidating Trust shall have the sole right to object to the allowance of any Claims or Interests provided for under the Plan on and after the Effective Date.

## 8.2.   **Filing of Claims and Causes of Action.**

On and after the Effective Date, the Liquidating Trustee shall have the exclusive right to file and prosecute, or continue to prosecute, any Claims and Causes of Action on behalf of the Liquidating Trust, including all Avoidance Actions and derivative Causes of Action.  Also, as set forth in Section 10.4 herein, the Liquidating Trustee shall substitute for any estate representative in any estate cause of action or contested matter.

# ARTICLE 9
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

All executory contracts and unexpired leases that are not assumed and assigned to Purchaser pursuant to the Asset Purchase Agreement are rejected as of the date of entry of the Confirmation Order, unless otherwise stated in the Confirmation Order, or any other Order of the Court entered prior to the Effective Date, or which is the subject of a motion to assume pending on the Effective Date.

# ARTICLE 10
## EFFECT OF CONFIRMATION

10.1.   **Legally Binding Effect.**

The provisions of this Plan shall bind all Creditors and Interest Holders, whether or not they accept this Plan.   **On and after the Effective Date, all holders of Claims shall be precluded and forever enjoined from asserting or otherwise pursuing any derivative claims, including claims against third parties asserting alter ego claims, fraudulent transfer claims, guaranty claims or any type of successor liability based on acts or omissions of the Debtors.**

10.2.   **Limited Protection of Certain Parties in Interest.**

Neither (a) the Debtors, the Committee, the Liquidating Trustee, PNC or any of their respective employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any the Debtors, the Committee, the Liquidating Trustee or PNC, nor (b) each Professional for the Debtors or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them (the persons identified in (a) and (b) are collectively referred to as "Protected Persons"), shall have or incur any liability to any Person or Entity under any theory of liability for any act or omission occurring on or after the Petition Date in connection with or related to the Debtors, the Chapter 11 Cases, or the Estates, including, but not limited to, (i) formulating, preparing disseminating, implementing, confirming, consummating or administering this Plan (including soliciting acceptances or rejections thereof); or (ii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan, except for acts constituting willful misconduct, gross negligence, or *ultra vires* activity and in all respects such Protected Persons shall be entitled to rely in good faith upon the advice of counsel. In any action, suit or Legal Proceeding by any Person contesting any action by, or non-action of any Protected Person as constituting willful misconduct, gross negligence, or *ultra vires* activity or not being in good faith, the reasonable attorneys' fees and costs of the prevailing party will be paid by the losing party and as a condition to going forward with such action, suit, or Legal Proceeding at the outset thereof, all parties thereto will be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.

The Debtors believe that the limited protections described in this section are appropriate under the circumstances of these Chapter 11 Cases for several reasons.  First, these protections were part of the intended terms of the settlement among the Debtors, PNC, and the Committee. The settlement is an integral part of the structure of the Plan, and without the settlement,

unsecured creditors would be very unlikely to receive any recovery.  Second, as to the Estates' professionals, the presence of these protections was necessary to ensure that the professionals retained by the Debtors and the Committee were free to discharge their duties to the Estates and the Debtors' creditors without the threat that they would later be sued for simply doing their jobs. The protections are narrowly tailored and do not protect the professionals from the consequences of any misconduct or wrongdoing on their part.

10.3.   **[Reserved]**

10.4.   **Preservation and Retention of Claims and Rights.**

Confirmation of this Plan effects no settlement, compromise, waiver or release of any Claim, Cause of Action, Right of Action or claim for relief unless this Plan or the Confirmation Order specifically and unambiguously so provides.   The non-disclosure or non-discussion of any particular Claim, Cause of Action, Right of Action or claim for relief is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim, Cause of Action, Right of Action or claim for relief.

**The Debtors, the Liquidating Trust and the Liquidating Trustee reserve and retain any and all claims and rights against any and all third parties not otherwise released herein, whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, the Record Date and/or any Distribution date, including, without limitation, any and all Causes of Action, Rights of Action and/or claims for relief that the Debtors, the Liquidating Trustee or the Liquidating Trust may have against (i) any insurer and/or insurance policies in which either the Debtors and/or their current or former personnel have an insurable or other interest in or right to make a claim against, any other of the Debtors' insurers; (ii) any recipient of a transfer identified in the Debtors' statements of financial affairs, including any amendments thereto, filed in these Chapter 11 Cases based on Causes of Action under chapter 5 of the Bankruptcy Code; or (iii) the parties set forth on the attached <u>Exhibit 3</u> based on any Causes of Action, Rights of Action, Avoidance Actions or claims for relief.  The entry of the Confirmation Order shall not constitute *res judicata* or otherwise bar, estop or inhibit any actions by the Debtors, the Liquidating Trust or the Liquidating Trustee relating to any claims, Causes of Action or Rights of Action referred to in this Article 10.4, or otherwise, except as released and barred in Article 10.2.  Except as specifically set forth herein, the Liquidating Trustee shall constitute the representative of the Estates for purposes of retaining, asserting and/or enforcing Rights of Action under § 1123(b)(3)(B) of the Bankruptcy Code.  On the Effective Date, the Liquidating Trustee shall be substituted as a party of record in all pending litigation brought by or against the Debtors without need for further order of the Bankruptcy Court**.

### ARTICLE 11
### <u>CONFIRMATION OF THE PLAN</u>

11.1.   **Confirmation Hearing.**

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan ("<u>Confirmation Hearing</u>").   The Confirmation Hearing has been scheduled before the Honorable Marvin Isgur, United States Bankruptcy Judge, on October [*], 2016, at   [*].m. (Houston time), in Courtroom No. 404, United States Courthouse, 515 Rusk

Avenue, Houston, Texas 77002.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) provides that any party in interest may object to confirmation of the Plan.  However, an impaired Creditor, who votes to accept the Plan, may not have standing to object to the Plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and any applicable Local Rules of the Bankruptcy Court.  **The deadline for filing objections to confirmation of the Plan is October [\*], 2016**.  Objections to confirmation must be filed with the Clerk of Court.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### 11.2.   Statutory Requirements for Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  As set forth in § 1129 of the Bankruptcy Code, these requirements are as follows:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The proponent of the Plan complies with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or to be made by the Plan proponent, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with the cases, or in connection with the Plan and incident to the cases, has been approved by, or is subject to the approval of, the Court as reasonable.

5.      The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint Plan with the Debtor, or a successor to the Debtor under the Plan; and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and with public policy; and the proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

6.      Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor, has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

7.      With respect to each class of impaired claims or equity interests:

(a)      each holder of a claim or interest of such class:

(i) has accepted the Plan; or

(ii) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Plan Proponent were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

(b) if § 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of the effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secured such claims.

8. With respect to each class of claims or interests:

(a) such class has accepted the Plan; or

(b) such class is not impaired under the Plan;

9. Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that:

(a) with respect to a claim of a kind specified in § 507(a)(1) or § 507(a)(2) of the Bankruptcy Code, on the effective date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b) with respect to a class of claims of a kind specified in §§ 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, each holder of a claim of such class will receive:

(i) if such class has accepted the Plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; and

(c) with respect to a claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim.

10. If a class is impaired under the Plan, at least one class of claims that is impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider.

11. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the plan proponent or any successor to the plan proponent under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of Chapter 11, and that the proposal of the Plan is made in good faith.

The Debtors further believes that the holders of all Claims impaired under the Plan will receive payments or distributions under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if the Debtors were liquidated in a case under Chapter 7 of the Bankruptcy Code.

Finally, as the Plan contemplates the final wind down of the Debtors, the Debtors do not believe that the confirmation of the Plan will likely be followed by the need for further financial reorganization of the Debtors.

## 11.3.   **Cramdown.**

The equity interest holders will be treated as a cramdown class under §1129(b)(2)(C).  In the event that any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if, as to each impaired class which has not accepted the Plan, the Plan does not discriminate unfairly and is "fair and equitable."   A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in § 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.      With respect to a class of secured claims, the Plan provides:

(a)      (i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Plan Proponent or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)      for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)      for the realization by such holders of the indubitable equivalent of such claims.

2.     With respect to a class of unsecured claims, the Plan provides:

   (a)     that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

   (b)     the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property.

3.     With respect to a class of interests, the Plan provides:

   (a)     that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

   (b)     the holder of any interest that is junior to the interests of such class will not receive or retain under the Plan on account of such junior interest any property.

The Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims and the cramdown class of equity interests.  The Debtors believe that the Bankruptcy Court will find these requirements satisfactory and will confirm the Plan.

**11.4.    Conditions Precedent to Effective Date.  Unless waived, the following conditions are necessary before the Effective Date:**

11.4.1  The Confirmation Order, in a form and in substance reasonably satisfactory to the Debtors, shall have been entered by the Bankruptcy Court;

11.4.2  The form of all documents necessary or appropriate to give effect to the transactions contemplated under the Plan, if any, have been approved and executed;

11.4.3  All required consents, approvals, and authorizations, if any, have been obtained;

11.4.4  There shall be no stay of the Confirmation Order in effect; and

11.4.5  All other actions, documents and agreements necessary to implement the Plan shall have been waived, effected or executed.

The Effective Date is defined in the Plan as the day selected by the Debtors that is no earlier than ten (10) Business Days after (i) the date the Confirmation Order becomes a Final Order; and (ii) all conditions specified in Article 13 of the Plan have been satisfied or waived on or before 90 days after entry of the Confirmation Order, unless the Confirmation Order is stayed.

11.5.    **Annulment of Plan if Conditions Not Waived or Satisfied.**

The Debtors reserve the right to waive any of the conditions precedent to the Effective Date.  If any of the conditions precedent are not waived, and are not satisfied within the specified time periods or can no longer occur, the Confirmation Order will be annulled and the Debtors and all parties in interest will return to the *status quo ante* immediately before the entry of the Confirmation Order.

11.6.    **Retention of Jurisdiction by Bankruptcy Court.**

The Court shall retain and have exclusive jurisdiction over these Chapter 11 Case to the maximum extent provided by law for the follow purposes following the Confirmation Date: (i) to determine any and all objections to the allowance and classification of Claims or Interests; (ii) to determine the validity and priority of any Lien; (iii) to determine the Allowed Amount of any Claim, whether secured or unsecured; (iv) to allow any and all applications for allowances of compensation and reimbursement of expenses payable from the Estate; (v) to determine any and all applications or motions pending before the Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any executory contract or unexpired lease; (vi) to consider and approve any modification of the Plan, remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Court, including the Confirmation Order; (vii) to hear and determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or related to any of the foregoing; (viii) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor; (ix) to issue orders in aid of execution and implementation of the Plan and the Confirmation Order, to the extent authorized by 11 U.S.C. § 1142 or provided by the terms of the Plan; and (x) to hear and determine matters concerning federal, state or local taxes in accordance with  §§ 346, 505 or 1146 of the Bankruptcy Code.

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334.

## ARTICLE 12
## MISCELLANEOUS PROVISIONS

12.1.    **Bar Date for Administrative Claims.**

The last day to file an application for allowance of an Administrative Claim (other than (i) quarterly U.S. Trustee fees and (ii) Professional Fee Claims), shall be 20 days after the Effective Date unless otherwise established by a Final Order.

No Administrative Claim, other than Professional Fees and United States Trustee fees, will be paid unless the holder of such Administrative Claim has filed an application for payment of such Administrative Claim on or before the Administrative Claim Bar Date.  Upon the filing of any application for payment, the entity seeking payment of an Administrative Claim shall provide notice by United States Mail in accordance with the Bankruptcy Rules.   Any Administrative Claim, other than Professional Fees and United States Trustee fees, not filed in accordance with this section shall be barred and the Debtors, the Liquidating Trust and the Liquidating Trustee shall have no liability for payment of any such Administrative Claim.

12.2.    **Objections to Administrative Claims.**

Objections to Applications for payment of Administrative Claims may be filed by any party in interest.  In order to be considered, such objections must be filed on or before the 21st day following the date on which the application was filed.  Any objections will be determined by the Bankruptcy Court.

12.3.    **Payment of Professional Claims.**

Each holder of a Professional Fee Claim shall be paid in respect of such Professional Fee Claim in Cash, in full, on the Effective Date, or, if such Claim has not been approved by the Bankruptcy Court on or before the Effective Date, promptly after Bankruptcy Court approval of the Professional Fee Claim by a Final Order.  Final fee applications for any Professional Fee Claim that has not been approved as of the Effective Date shall be filed within forty-five (45) days of the Effective Date and such applications and objections thereto (if any) shall be filed in accordance with and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, applicable local rules, and the Fee Procedures Order.  Unless otherwise ordered, the failure to file an application by the foregoing deadline shall constitute a waiver of all such Professional Fee Claim.

12.4.    **Payment of United States Trustee Fees.**

Within thirty (30) days of the date that such payments are due, the Liquidating Trustee shall pay all amounts owing to the United States Trustee as fees and costs imposed in connection with these Chapter 11 Cases.

12.5.    **Employee Benefits Plans.**

Unless terminated earlier under the terms of the Asset Purchase Agreement, prior to thirty (30) days after to the Effective Date, all Employee Benefit Plans shall be terminated in accordance with the applicable provisions of the state and federal law.

12.6.    **Amendment of the Plan.**

The Plan may be amended or modified by the Debtors before, or by the Liquidating Trustee after the Effective Date, as provided in § 1127 of the Bankruptcy Code.

12.7.    **Timing of Distributions.**

Unless otherwise specified herein, all payments and Distributions shall be made on a Payment Date determined by the Liquidating Trustee after consultation with the Post-Confirmation Committee.  When a provision of this Plan requires that a payment shall be made on a certain date, such payment may be made (i) at any time prior to the date on which such payment is due; (ii) in more frequent intervals than set forth in such provision of the Plan; or (iii) not more than 14 days after the date any such payment is due.  Notwithstanding the foregoing, no payment shall be considered late or otherwise result in a default unless the Liquidating Trustee has failed to make the payment after the passage of 30 days following the receipt by the Liquidating Trustee of a written notice advising that a payment has not been received in accordance with the times set forth in this paragraph.

12.8.    **Withdrawal of Plan.**

Upon termination of the Asset Purchase Agreement in accordance with its terms and satisfaction of the Debtors' obligations thereunder, if any, the Debtors reserve the right to withdraw this Plan at any time prior to the Confirmation Date.  If the Debtors withdraw this Plan prior to the Confirmation Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute an admission, waiver or release of any Claims by or against the Debtors, the Estates or any other person, or to prejudice in any manner the rights of the Debtors, the Estates or any person in any further Legal Proceedings involving the Debtors.

12.9.    **Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code §§ 1101 and 1127(b).

12.10.    **Conflict.**

Except as otherwise provided in the Plan, to the extent the Confirmation Order and/or this Plan are inconsistent with the Disclosure Statement, any other agreement entered into between the Debtors and any third party, the Plan controls the Disclosure Statement and any such agreements and the Confirmation Order (and any other orders of the Bankruptcy Court) controls the Plan.  To the extent that the Plan or the Confirmation Order conflicts with the Liquidating Trust Agreement, first, the Plan shall control the Liquidating Trustee Agreement and the Confirmation Order shall control the Plan.  To the extent the Asset Purchase Agreement is inconsistent with the Disclosure Statement or any other agreement entered into between the Debtors and any third party, the Asset Purchase Agreement shall control.

12.11.    **Severability.**

The provisions of the Plan shall not be severable unless such severance is agreed to by the Debtors and such severance would constitute a permissible modification of the Plan pursuant to § 1127 of the Bankruptcy Code.

12.12.    **Setoffs.**

The Liquidating Trustee may, but shall not be required to, set off against any Claims and the payments or Distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities and claims of every type and nature whatsoever that the Estates or the Liquidating Trust may have against the Holder of any Claim, but neither the failure to do so nor the Allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Liquidating Trustee or the Liquidating Trust of any such claims they may have against such Holder of any Claim, and all such claims shall be reserved for and retained by the Liquidating Trustee.

12.13.    **Other Considerations.**

The Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the Chapter 11 Case;

(b) alternative plans of reorganization/liquidation; (c) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code; and (d) dismissal of the Chapter 11 Case.

## 12.14. **Alternative Plans of Liquidation.**

The Debtors assert that, if the Plan is not confirmed, the Debtors or another party in interest in the case could attempt to formulate and propose a different plan or plans. Such plans might, theoretically, involve some other form of reorganization or liquidation of the Debtors' operations and assets. Any alternative plans, however, would likely result in additional administrative expenses to the estate and would provide little or no benefit. The Plan proposed by the Debtors is straightforward, meets the requirements of § 1129 and provides the best outcome for Creditors.

## 12.15. **Liquidation under Chapter 7.**

The Debtors believe that creditors' interests have been best served by the filing of these Chapter 11 Cases. Had the Debtors instead filed for liquidation under chapter 7 of the Bankruptcy Code rather than under chapter 11, all going-concern value of the Debtors' businesses and assets would have been lost, given that a chapter 7 filing would have required the Debtors to shut down their operations. This would have had a detrimental effect on the value of the Debtors' assets. During the pre-petition marketing efforts by both the Debtors and Simmons, the offers submitted by entities interested in simply liquidating the Debtors' assets were significantly lower than those offers submitted by entities interested in acquiring them as part of a going concern. Moreover, the Debtors believe that the very successful outcome of the auction was due in large part to the ability of the purchaser to acquire assets that were operation-ready and to have access to an existing pool of employees.

The Debtors believe that the ability to capture the going-concern value of their assets and operations, which resulted in the competitive bidding by strategic purchasers other than Vallourec, was clearly in the best interest of this estate and yielded a higher net recovery to creditor constituencies as compared to the simple liquidation of their assets in a chapter 7. Additionally, the Debtors believe that conversion to a chapter 7 liquidation would have (a) triggered an event of default under the DIP facility, thereby depriving the Debtors of necessary funding, (b) allowed Vallourec to terminate the APA, most likely resulting in the loss of the going concern value of the Debtors assets and no viable auction, and (c) add to the additional administrative expense of statutory fees for the chapter 7 trustee as well as additional professional fees for the trustee's professionals.

Equally important, the successful outcome of the sale of the Debtors assets paved the way for the settlement with PNC—an outcome that is unlikely to have occurred had the Debtors' cases been converted to chapter 7. The settlement ensures that the value of all unencumbered assets will be distributed to unsecured creditors, rather than being applied to costly litigation with PNC or to satisfaction of the Debtors' administrative and priority claims.

Attached hereto as **Exhibit 4** is a chart reflecting the Debtors' distribution and liquidation analysis under the Plan and a under liquidation in chapter 7. As reflected in that analysis, the Debtors believe that the likely distribution to holders of Allowed Unsecured Claims under the Plan will be approximately 3.7%, while those creditors would likely receive no distribution under chapter 7.

12.16.  **Risk Factors.**

There are certain risks inherent in the liquidation and administration process under the Bankruptcy Code.  If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if Creditors and Interest holders accept the Plan.  Although the Debtors believe that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtors to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan.  The Debtors believe that the solicitation of votes on the Plan will comply with § 1126(b) and that the Bankruptcy Court will confirm the Plan.  The Debtors cannot, however, provide assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a re-solicitation of acceptances.

12.17.  **Taxation.**

12.17.1 **Introduction.**

The following discussion summarizes certain federal income tax consequences of the transactions described herein and in the Plan.  This discussion is for informational purposes only and does not constitute tax advice.  This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice as of the date of this Disclosure Statement and will not be updated for subsequent tax or factual developments.  Neither the impact on foreign holders of claims and equity interests nor the tax consequences of these transactions under state and local law is discussed.  Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, insurance companies, mutual funds, regulated investment companies, real estate investment trusts, trusts, S corporations, dealers and traders in securities and currencies, partnerships and other entities classified as partnerships for federal tax purposes and tax-exempt organizations.  Furthermore, due to the complexity of the transactions contemplated in the Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties including subsequent legislative and other tax changes.  No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service ("IRS") on these or any other tax issues.  There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

12.17.2 **Tax Consequences to the Debtors and Equity Interest Holders.**

The Debtors will realize cancellation of indebtedness ("COI") income in respect of each Claim generally in an amount equal to the excess, if any, of (i) the portion of the Claim (including accrued and previously deducted but unpaid interest) from which the Debtor is (or is deemed to be) discharged; and (ii) the sum of any cash or the "issue price," under the Internal Revenue Code of 1986 (the "Internal Revenue Code") §§ 1273(b) and 1274, of any debt

obligations distributed under the Plan in discharge of such Claims. The exact amount of COI income realized upon consummation of the Plan has not been finally determined. Under the Internal Revenue Code, a taxpayer is generally required to include COI income in gross income. COI income is not includable in gross income, however, if it occurs in a case under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a Court in such case and the cancellation of indebtedness is granted by the Court or is pursuant to a plan approved by the Court. The Debtors' COI income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtors. COI income that is excluded from gross income will reduce certain tax attributes of the taxpayer, including net operating loss suspended under Internal Revenue Code Section 1361(d) (hereinafter "NOLs") carryovers, capital loss carryovers and the tax basis of assets, in a specified order of priority beginning with the NOLs and NOL carryovers, unless the taxpayer elects to have the reduction applied first to the tax basis of depreciable assets. The reduction of tax basis is limited to the excess of (i) the aggregate of the tax bases of the taxpayer's property (determined immediately after the discharge); and (ii) the aggregate liabilities of the taxpayer (determined immediately after the discharge). The exclusion for COI is deemed to occur immediately following the end of the Debtors' tax year, and not during the tax year.

The Debtors will recognize gain or loss on the sale of assets to third parties equal to the sales price of such assets less the Debtors' adjusted tax basis in such properties. The sales price includes all indebtedness assumed by a buyer as well as all other consideration received by the Debtors. The amount and tax character of such gain and loss will depend on the applicable facts and circumstances.

It is anticipated that cancellation of equity interests will result in a loss each such Equity Interest Holder in the amount of such Equity Interest Holder's U.S. federal income tax basis in their Debtor shares redeemed or deemed redeemed in connection with such distribution. Such loss will as a general matter likely constitute a capital loss, and individual Equity Interest Holders of Debtors who have held their shares in Debtors to which such distributions relate for in excess of one (1) year may be entitled to reduced long-term capital gain rates.

### 12.17.3  Tax Consequences to Creditors.

**In General**. The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the Claimant receives consideration in more than one tax year, (c) whether the Claimant is a resident of the United States, (d) whether all the consideration by the Claimant is deemed to be received by that Claimant as part of an integrated transaction, (e) whether the Claimant utilizes the accrual or cash method of accounting for tax purposes, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

**Gain or Loss on Exchange**. Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized

generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

The tax treatment of an Allowed Claim for accrued unpaid interest will depend on the Claimant's tax basis in such Claim, which primarily depends on whether the Claimant has previously recognized income for the accrual of such interest and/or recognized a loss with respect to same. Any such holders should consult with their tax advisors regarding the tax treatment of any such accrued unpaid interest.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### 12.17.4       Information Reporting and Backup Withholding.

Under the backup withholding rules of the Internal Revenue Code, holders of Claims and Equity Interest Holders may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims and Equity Interests may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 12.17.5       Importance of Obtaining Professional Assistance.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. TO COMPLY WITH TREASURY DEPARTMENT CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT, THE PLAN OR ANY RELATED MATERIALS, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; AND (B) ANY SUCH DISCUSSIONS ARE BEING USED ONLY IN CONNECTION WITH SATISFYING THE REQUIREMENTS IMPOSED UNDER THE BANKRUPTCY CODE FOR DISCLOSURE STATEMENTS, AND (C) YOU SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR WITH RESPECT TO YOUR FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES BASED ON YOUR PARTICULAR CIRCUMSTANCES.**

**ARTICLE 13**
**CAUSES OF ACTION**

13.1.   **Preferences.**

Under the Bankruptcy Code, the Debtors may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of the bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtors been liquidated under Chapter 7 of the Bankruptcy Code.

In the case of "insiders," (including control persons, officers, directors, and affiliates) the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to such recoveries.  Generally, transfers made in the ordinary course of the Debtors' and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable as preferential payments.  Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property.

If a transfer is recovered by the Liquidating Trustee, the transferee will be permitted an Allowed General Unsecured Claim to the extent of the recovery unless otherwise prohibited by law.  The Debtors/Liquidating Trustee reserve the right to bring preferential transfer claims against the parties identified as receiving transfers within 90 days of the Petition Date, and against insiders who received payments within the previous year, as described on the attached **Exhibit 3**.

13.2.   **Fraudulent Transfers.**

Under the Bankruptcy Code and various state laws, the Debtors may recover certain transfers of property, including the grant of a security interest in property or release of a debt owed to the Debtor, made while insolvent or which rendered the Debtors insolvent or that was made with the actual intent to hinder, delay, or defraud creditors.  The Debtors/Liquidating Trustee reserve the right to bring fraudulent conveyance claims.

The Debtors have not conducted a detailed analysis of potential recoveries under Chapter 5 of the Bankruptcy Code but believe that potential claims may exist.  A list of the known payments made within the previous year to insiders, and made within the past two years is  set forth in the Debtors' statements of financial affairs, which are incorporated herein.  **Creditors, Interest Holders and parties-in-interest are advised that if they received a voidable transfer, they may be sued whether or not they vote to accept the Plan**.  All avoidance actions and rights pursuant to §§ 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 and 724 of the Bankruptcy Code and all causes of action under state, federal or other applicable law shall be retained and may be prosecuted or settled by the Liquidating Trustee in his or her sole discretion.

Any person who received a transfer (including the imposition of a lien, the payment of money, or the forgiveness of a debt owed to the debtor, among other things) within the time allowed by applicable law from or on behalf of any of the Debtors, that transfer may be avoided and recovered.  Specifically, transfers made for the benefit of former employees or officers that

were not actually earned, or that resulted in a debtor receiving less than reasonably equivalent value, or that were made with the intent to hinder, delay, or defraud creditors of a debtor are subject to recovery.

Persons who were involved with leases and/or real property transactions before the Petition Date involving one or more Debtors' real property located on or near Beasley, Texas; Odessa, Texas;  Rifle, Colorado; Williston, North Dakota; and Evanston, Wyoming, may be subject to suit to the extent that an asset that was transferred (including, but not limited to, the imposition of a lien or servitude) may be subject to avoidance and recovery in a lawsuit.

To the extent that amounts are recovered, it will enhance the returns to the holders of Unsecured Claims.

### 13.3.   **Other Causes of Action.**

THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY RIGHTS OF ACTION, AVOIDANCE ACTIONS, OR OBJECTIONS TO PROOFS OF CLAIM.  ALL SUCH RIGHTS ARE SPECIFICALLY PRESERVED, UNLESS SPECIFICALLY RELEASED UNDER THE PLAN.

"D&O Claims" are preserved, which includes without limitation claims against any manager, control person, officer or director of any Debtor that served in that role for the preceding six (6) years before the Petition Date.  A list of the former officers, managers, directors and control persons are included in Exhibit 3.  The D&O Claims include, but are not limited to, claims for breach of fiduciary duty and wrongful acts connected to the governance of any Debtor, any subsidiary of a Debtor, or any related entities, and any transactions therewith, including without limitation the mismanagement of Debtors' foreign subsidiaries.

Creditors and other parties in interest should understand that certain legal rights, claims and causes of action the Debtors may have against them, if any exist, are retained under the Plan for prosecution by the Liquidation Trustee, unless expressly released under the Plan, for the benefit of the Plan Trust as more fully discussed herein.  As such, Creditors and other parties in interest are cautioned not to rely on (i) the absence of the listing of any legal right, claim or cause of action against a particular Creditor or other party in interest in the Disclosure Statement, Plan, Schedules of Assets and Liabilities, or Statement of Financial Affairs; or (ii) the absence of litigation or demand prior to the Effective Date as any indication that the Debtors or the Plan Trustee do not possess or do not intend to prosecute a particular legal right, claim or cause of action if a particular Creditor or other party in interest votes to accept the Plan.  It is the expressed intention of the Plan to preserve Avoidance Actions, D&O Claims, Rights of Action, and other causes of action whether now known or unknown.

As set forth in the Plan, the Debtors believe that certain causes of action exist that will be evaluated, pursued and resolved by the Liquidating Trustee in his or her sole discretion, including but not limited to those specifically identified on Exhibit 3 to the Plan.

## ARTICLE 14
## VOTING PROCEDURES AND REQUIREMENTS

14.1.   **Ballots and Voting Deadline.**

A ballot to be used to vote to accept or reject the Plan is enclosed with this Disclosure Statement. A Creditor who is voting must (1) carefully review the ballot and instructions thereon, (2) complete and execute the ballot indicating the Creditor's vote to either accept or reject the Plan, and (3) return the executed ballot to the address indicated thereon by the deadline specified by the Bankruptcy Court.

**The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the Debtors no later than October [*], 2016.**

If you hold an impaired Claim against the Debtor, return your ballot to:

Rotary Drilling Tools Ballot Processing Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA  90245
Toll Free Number:  888-830-4662

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED
NO LATER THAN OCTOBER __, 2016**

14.2.   **Creditors Entitled to Vote.**

Any Creditor whose Claim is impaired under the Plan is entitled to vote, if either (i) the Debtors have scheduled its Claim on its Statement of Liabilities and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Creditor has filed a Proof of Claim on or before the last date set by the Bankruptcy Court for filing Proofs of Claim and no objection has been filed to such Claim.

Holders of Disputed Claims are not entitled to vote on the Plan. Any Claim to which an objection has been filed and remains pending, is not entitled to vote unless the Bankruptcy Court, upon motion by the Creditor who holds a Disputed Claim, temporarily allows the Claim in an amount that it deems proper for accepting or rejecting the Plan by the filing of a motion. Any such motion must be heard and determined by the Bankruptcy Court before the date established by the Bankruptcy Court as the final date to vote on the Plan pursuant to Bankruptcy rule 3018. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Creditor was not solicited or obtained in good faith or according to the provisions of the Bankruptcy Code.

Classes of Claims that are not impaired are deemed to have accepted a plan of reorganization pursuant to § 1126(f) and, therefore, are not entitled to vote on a plan. Pursuant to § 1126, only classes of claims or interests that are "impaired" are entitled to vote on a plan of reorganization. Generally, a claim is impaired if the plan of reorganization alters the legal, equitable, or contractual rights to which the holder of such claim is otherwise entitled.

14.3.   **Voting Procedures.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Bankruptcy Court.  The Debtors also reserve the right to oppose any Ballot (subject to final determination by the Bankruptcy Court) that is not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to ask the Bankruptcy Court to waive any defects or irregularities or conditions or delivery as to any particular Ballot.  The interpretation by the Bankruptcy Court of the provisions of this Disclosure Statement and the Ballots will be final and binding.  Unless waived, any defects or irregularities concerning deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  The Debtors will be under a duty to provide notification of defects or irregularities with respect to deliveries of Ballots within 12 hours after the Ballot deadline.  Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made and will be invalidated unless or until all defects and irregularities have been timely cured or waived.

14.4.   **Vote Required for Class Acceptance.**

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Claims as the acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half in number of the allowed Claims of the class actually voting to accept or reject the proposed plan.

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Interests as the acceptance by holders of at least two-thirds (2/3) in amount of the allowed Interests in the class actually voting to accept or reject the proposed plan.

14.5.   **Cramdown.**

If the Plan is not accepted by all classes of impaired Creditors, the Debtors reserve the right to withdraw the Plan.  If the Plan is accepted by one or more Classes of impaired Creditors, the Debtors will request the Bankruptcy Court to approve the Plan under 11 U.S.C. § 1129(b), including the cramdown of equity interest holders.

**THE DEBTORS AND THE COMMITTEE STRONGLY URGE ALL IMPAIRED CREDITORS TO VOTE TO ACCEPT THE PLAN**.

*Remainder of Page is Intentionally Left Blank*

**Date: September 28, 2016.**

**DEBTORS:**

**Rotary Drilling Tools USA, LLC**


By:  ___/s/ *Bryan M. Gaston*_____
Name:  Bryan M. Gaston
Title:   Chief Restructuring Officer

**Tubular Repair, LLC**


By:  ___/s/ *Bryan M. Gaston*_____
Name:  Bryan M. Gaston
Title:   Chief Restructuring Officer


**Rotary Drilling Holdings IV, LLC**

By:  ___/s/ *Bryan M. Gaston*_____
Name:  Bryan M. Gaston
Title:   Chief Restructuring Officer


**Pipe Coatings International LLC**

By:  ___/s/ *Bryan M. Gaston*_____
Name:  Bryan M. Gaston
Title:   Chief Restructuring Officer

HOU:0026883/00003:1860939v3